## Case No. 13,786.

TAYLOR et al. v. The CATO.

[1 Pet. Adm. 48.] [1]

District Court, D. Pennsylvania. 1806.

SALVAGE — CLAIM BY CREW OF SALVED VESSEL — ABANDONMENT—RETURN—AMOUNT OF COMPENSATION.

1. The brig Alexander, on a voyage from Havanna to Philadelphia, met the Cato at sea in distress, and took all her crew and some part of her cargo on board, and left her. Six days after she again fell in with the Cato—The crew of the Cato assisted in saving other parts of the cargo. Salvage claimed by the crew of the Cato and half a share each allowed to those who had been active.

[Cited in Brevor v. The Fair American, Case No. 1,847; Clayton v. The Harmony. Id. 2,871; Bell v. The Ann, Id. 1,245; The Two Catherines, Id. 14,288; Lewis v. The Elizabeth and Jane, Id. 8,321; Poland v. The Spartan, Id. 11,246; The Waterloo, Id. 17,257; The Henry Ewbank, Id. 6,376; The Nathaniel Hooper, Id. 10,032; The Dawn, Id. 3,666. Approved in Cartwell v. The John Taylor, Id. 2,482. Cited in The Massasoit, Id. 9,260; The Niphon's Crew, Id. 10,277; The D. M. Hall v. The John Land, Id. 3,939; Hollingsworth v. Seventy Doubloons & Three Small Pieces of Gold, Id. 6,620; The Persian Monarch, 23 Fed. 822; The Dupuy De Lome, 55 Fed. 97.]

2. About two-fifths of the gross sales allowed as salvage.

[Followed in Bell v. The Ann, Case No. 1,245. Cited in Hand v. The Elvira, Id. 6,015.]

In admiralty.

PETERS, District Judge. The brig Alexander, Heartwell, master, laden with a valuable cargo, on her passage from Havana for Philadelphia, on the sixth of September last, met, on the high seas, with the

ship Cato, Pyle, master, on a voyage from New Orleans to Bordeaux, in great distress, and on the point of perishing. The master and crew of the Cato were taken on board of the Alexander, with part of the cargo, consisting of 6 seroons of indigo, thirteen bags of coffee, and as much provisions as supported those of the Cato's equipage, while on board the Alexander. The Alexander then pursued her voyage; but on the twelfth of the same month, fell in again with the Cato, and found near her a vessel taking out goods. Captain Heartwell sent his boat, in which went Captain Pyle, the second mate, and the boatswain of the Cato, and saved from the abandoned vessel 20 bales of cotton, 9 seroons of indigo, a new hawser, some beef, and other articles. It appears by the testimony, that "it was blowing hard." The Alexander arrived in Philadelphia with the articles saved (a small part whereof consisted of articles of furniture, and apparel of the ship) and the master and crew of the Cato, on the 25th of the same September. It does not appear that any extraordinary risk was run, or exertions made. The time occupied in saving the goods was but short, "a few hours," at each meeting with the Cato.

This case, in all its essential features relating to the situation of the vessel, the mode of obtaining the articles saved, the assistance given by the crew of the deserted ship, and all the leading circumstances bears, by a curious coincidence, an exact resemblance to that of The Belle Creole [Case No. 17,165], determined in this court in 1792.

But a dispute in this cause arises between the crew of the deserted ship Cato, and the salvors, the officers and crew of the brig Alexander. The crew of the Cato insist on sharing the part to be allotted to the crew of the brig Alexander, on equal terms. They alledge that, by the knowledge of the master, and others of the Cato's equipage, who adventured in a second enterprise for saving, after the Cato had been left by the brig Alexander for several days, and again discovered, the most valuable goods were rescued from destruction by their position in the ship being pointed out. The master and some of the crew assisted in this salvage, at personal risks, while others of them navigated the brig Alexander, which would have been exposed to hazard, and perhaps loss, without these assistants; as the crew of the brig were incompetent to navigate and to save goods out of the Cato at the same time. It was said that assurances were given to the Cato's crew (at the time) of equal benefit of salvage.

On these points I must refer to the opinion I gave in the case of The Belle Creole, in which the same kind of circumstance and agreement occurred. Much reliance was placed by the counsel for the crew of the Cato, who laboured to increase the quantum of salvage as a common concern, on the case

of The Aquila, 1 C. Rob. Adm. 42, 45, &c. It is a mere difference of the interpretation of the word derelict, as it respects "boats, or other vessels, forsaken and found on the sea, without any person in them,"—which creates any shadow of distinction between the application of the word in the case of The Aquila, and my definition or understanding of the term, as given in the decree alluded to. Sir William Scott has the same ideas of the civil law meaning of derelict, to which a right in the first occupant attaches. The abandonment must be voluntary, and not produced by force or necessity. All maritime derelicts (vessels deserted) are subjects of salvage, and not rights in toto, acquired by mere possession. When I was under the necessity of deciding a variety of points on the subject of salvage, it would much have relieved me, to have seen the decisions of the cases of The Aquila, 1 C. Rob. Adm. 42; and that of The Two Friends, Id. 278. There is so evident a coincidence of opinion, in the principal points so much laboured in several salvage cases here, that I was the more confirmed in the decisions I then gave, by the concurrence of sentiment evidenced by Sir William Scott in both these cases, which I had not seen till long after my decisions on similar points. One point has never been stirred, as no occasion called it forth, i. e. that deserted ships and goods, where no owners appear, are national droits, paying salvage to those who find and save them. This excludes, however, all idea of occupantis fiunt derelicta. It will be seen there (and in other modern elementary writers and reporters) concisely stated that the old and unjust claims of nations to wrecks, jettisons, &c. &c. to the exclusion of owners, are now obsolete, as they were ever unjust. The old rule of allowing half to the finder, or salvor, of deserted vessels, jettisons, wrecks, &c. without regard to degree of merit, labour, or difficulty, has been long exploded, as hath also been the antiquated idea of its being necessary that some living animal should be found in a deserted ship. Any mark by which the property can be known is a sufficient designation of ownership.

The third article of the laws of Oleron (Sea Laws, 123), has been produced, together with the commentaries upon it, to shew that seamen saving from wreck are entitled to reward (where sufficient property is saved) beyond the amount of wages. I never disputed this doctrine in the cases to which it seemed applicable. Seamen are entitled or not to wages, in cases of wreck, according to the merit of their services in that distressing exigency. Those who do not assist, do not receive their wages, which are lost by the wreck, and recovered in equivalent, by the services in saving. But the amount of wages recoverable is not precisely fixed; whether it shall be to the time of wreck, or for the voyage, is discretionary. Regard

must be had to merit and to the value of goods saved. I have thought it best to make the allowance to the crew of the deserted ship as an increase of the quantum of wages in account between them and the owners of the articles saved. I have kept the cases of the actual salvors, i. e. the owners, officers and crew of the ship saving, and those of the persons saved out of the perishing vessel, distinct and separate. I do not say that there may not be a case where the reward should exceed any wages; but, I consider the vessel affording the means of saving the lives of the perishing ship's company and her cargo, and her officers and crew, as the real and substantial salvors. The others only act vicariously, and hold subordinate situations. Without the ship and crew which afford them refuge and safety, of what avail would be all the efforts of the equipage of the perishing ship? The latter are bound, by every tie, to afford the former all assistance to return an obligation; and they are legally bound to assist in saving the goods to revive their claim to wages. What the amount shall be is to be considered as between them and the owners. They are not on a footing with the crew of the auxiliary vessel mentioned in the case of The Aquila. These had neither duties to perform or obligations to return. Yet they were placed in a secondary grade of merit.

In this case a decree of generosity has been evidenced by the salvors, who gave up to the crew of the Cato such of their private adventures as were in part saved. Another vessel, of the same owner, was found at the second discovery of the Cato, saving of goods, and keeping her from going down. I have heard of no claims brought forward on the part of this vessel. On the whole, I deem it best for the crew of the Cato, not herein provided for, to apply by petition for a distribution of the remnants and surplus, when their case, as between them and the owner, will be considered. I do not exactly recollect by what rule I estimated the quantum of the wages I ordered to be paid out of the surplus to the officers and crew of the Belle Creole, but I think it was beyond the wages due at the time of abandonment of the vessel. The officers of the vessel also had their private property restored. On some they paid a small salvage. I considered the captain as entitled to wages in quality of an auxiliary salvor, having a lien on the articles saved.

There is a mistake, evidenced by some of the counsel in this, and other salvage cases, as to the principles regulating the payment of wages to seamen in cases of wreck. The old law was, that they were payable only out of such parts of the wreck of the ship, her tackle and furniture, as were saved, but it was found that under this impression the whole attention of the mariners was occupied in saving those articles from which they derived advantage; and to ensure these they suffered the goods to perish. Modern au-

thorities are clear, that both ship and cargo, or such parts as are saved, are alike responsible; though it should seem that the old fund, to wit, the part of the ship's materials or furniture saved, should be exhausted before the cargo be made answerable. There is no foundation, in my recollection, for the assertion, that so much of the goods must be saved as will produce an amount of freight equal to wages. Freight, in cases of wreck, is not the rule, as it is in ordinary circumstances: freight and wages growing out of it, are lost by wreck, unless the goods are sent on to their destination. The claim of the sailor is not under his contract for wages out of freight, but in a new character, as a salvor, he regains a rightful claim to wages, restored by his exertions in rescuing the articles saved (whether parts of the ship or cargo) from the perils and loss to which the wreck had exposed them. The same principles apply in cases like that now before me.

Thus far I had proceeded with intent to close my observations, under the idea that the claimants in the Alexander had acquiesced in the decision in the case of The Belle Creole. But I found, on a second hearing, that their views were extended beyond the proportion of salvage given in that case. Much reliance was placed on precedents of greater proportions in other cases, determined both in England, and in the United States. But precedents seldom apply as to quantum. The whole subject is open to discretion; which is seldom alike in different individuals, determining on similar circumstances. It very rarely happens, that cases resemble each other so nearly as the present and that of The Belle Creole.

The case of Mason v. The Blaireau, 2 Cranch [6 U. S.] 240, determined in the supreme court of the United States, was now, and not before, produced. It was relied on by the counsel for the salvors in the Alexander, as well as the counsel for the crew of the Cato. It is very easy for counsel, among the items of inducements to salvage, to enumerate that of the value of property risked. It will appear that I have, in no instance, disregarded this circumstance; but it is difficult for any one to fix the proportion of weight it should have in the final adjustment; more than it could be with any accuracy ascertained, what was the relative value of exertion between a strong, or less athletic individual. It has never struck me as forcibly as its advocates seem to consider it. Extended as far as some have carried it, the whole value of the articles saved, with a sum paid in addition, would not compensate for the risk. But a leading and dominant consideration ought to be, the benefit arising to the owner. This may be afforded by a coaster of small value, as well as by an East Indiaman. The owner of the goods saved should pay salvage in proportion to his property saved, and the advantage he receives,

adding a reward as an example and incentive to others, and not according to the property of the salvor. I cannot depreciate the services performed by the officers and crew of a vessel of small value, in any thing like the proportion of value of a vessel and cargo of great amount. All such considerations render the subject difficult, arbitrary and uncertain. In the case of Mason v. The Blaireau [supra], there were great varieties of opinion, as will ever happen where no rules are, or can be, immutably fixed, between the judges of the several courts, on important points. In one of no small import, I know that one of the judges of the supreme court (Washington) on the point of Toole's participating in salvage, differed from all the others; he thought him not entitled to a share. It is not therefore surprising that in this court, it should be found impracticable to fix satisfactory rules either for the payer or receiver of salvage; both being generally discontented. Merchants give as little satisfaction as courts. Few salvors or owners give themselves the trouble of gaining information, farther than the immediate object of pursuit. Many years ago a case of salvage, of considerable importance, was referred by consent to three of the principal merchants in Philadelphia. They reported in favour of the salvors about $160; when no court could have been justified in decreeing less than ten times that sum. It was for me an unlucky decision, for no case of salvage, originating in this court, has been since referred to merchants.

There is now a better, though not yet a perfect understanding of this subject, among traders. Liberality and attention to general interests must qualify particular pursuits after gain. Cupidity, always disposed to be bribed, must have a douceur to unlock the generous feelings of the heart. But if salvors are too grasping, owners will err in refusing an adequate reward. They will suppose that they might as well abandon the property to the first occupant, as to suffer it to be consumed in remuneration and expenses.

I perceive in the decision of the case of Mason v. The Blaireau [supra], no opposition to the general principles of my decrees on this subject, on former occasions. I shall deem myself controlled by it, wherever I differ in opinion. The reward to Toole, was given from the peculiarity of the circumstances; this is always discretionary, and governed by the facts of every case: he received no wages in addition; he was remunerated for his uncommon exertions precedent to the salvage, as well as those made in navigating the wreck under great perils, during a long passage. I do not perceive any peculiar merit in the crew of the Cato, comparable to that of Toole. I join in feeling the policy and humanity displayed by the chief justice in behalf of the court, when the amount of property risked was

held up to encrease the quantum of salvage, and doubts expressed as to loss of insurance by such risk. I said in the case of The Belle Creole, that it was a risk "justified to the heart, but not to the law." I can find no adjudged case declaring the delay or deviation to save lives or goods, not to be a forfeiture of insurance. The argument of the chief justice in delivering the opinion of· the court (Mason v. The Blaireau, 2 Cranch [6 U. S.] 268, 269) may be considered as deciding the point so far as was incidentally required, in the case before the court. He alledges that the owner is made "his own insurer," which seems to decide that if others had taken his risk under common circumstances, this was a casualty not insured against, and a deviation putting the policy in jeopardy. Sir William Scott has made a similar and equally laudable declaration, on the subject of this risk, not creating a loss of insurance. It ought to be settled by the general consent of all merchants, in whatever capacity they find themselves, that these exertions to save life or property, should incur no loss to the salvors. It is for the general interests of commerce, that no discouragements should exist to deter from acts of humanity, which all in their turn may require. If it be agreed that this risk does not incur a loss of insurance, it lessens the pecuniary merit of the salvors; and diminishes the force of all arguments·grounded on the amount of property put to risk.

The case before me differs in no material circumstances from that of The Belle Creole, except, that the amount of the property saved is less. Some consideration may be· due to this·circumstance, though the case is otherwise one of no extraordinary merit. The Amiable loitered and risked with a view to further saving, after taking out the officers and crew of the Creole and some goods. But the second meeting of the Alexander with the Cato, was purely accidental, the gulf stream having wafted the Cato in a direction to be overtaken by the Alexander, driven from or retarded in her course, by adverse winds. Although it was said to have "blowed hard," it could not have been dangerous to a ship, when an open boat could live, and transport goods in safety. The delay of the brig was short; having been only "a few hours" at each meeting with the Cato. I therefore decree a compensation nearly in the proportion allowed in the case of The Belle Creole. I throw all costs and charges on the gross amount of sales, and out of the balance, allow, for salvage, a fixed sum of fifteen hundred dollars. This creates little difference, (though it throws some advantage in amount to the salvors, who risked as much to save less) between the proportion allotted in the case of The Creole and this case. I perceive that the superior court ([Mason v. The Blaireau] 2 Cranch [6 U. S.] 240), whose decisions direct all inferior jurisdictions, have considered the proportions established in the ordinance of France, quoted in the case of The Belle Creole, as just and exemplary in cases of maritime derelicts. I am therefore bound to respect this opinion, as directory, when cases are similar in circumstances.

In compliance with the principle established in the case of The Blaireau, I allow half the share of a mariner, to each of the officers and crew of the Cato who assisted in the second salvage. In this arrangement, I follow the example of Sir W. Scott, in the case of The Aquila; considering the crew of the Cato only in a secondary character. The other mariners of the Cato are left on the footing I have usually placed them, by the decisions of this court before stated. But those who have saved their adventures and paid no salvage, are not to receive the half share. I give this half share to those, (except as before excepted) who were actually employed in the second saving, because the amount of wages due was inconsiderable. The distribution of the salvage, among the owners and salvors, as formerly established, was according to the agreements, or articles of ships, having letters of marque, and capturing prizes. I chose these for my guide, in preference to privateers, because they paid wages and had cargoes at risk. But the decision in the case of Mason v. The Blaireau, seems to direct a less allowance to owners of ships employed in saving; and a portion of that is allotted to the freighters or owners of the cargo—a remuneration not common, if ever before made. In this case, the owners claim a greater allowance as having risked the goods of the freighters. Only the owners of the brig Alexander, come forward to claim salvage in this case. In argument, it was said, they risked the goods and freight. I have heretofore, when the point has occurred between owners and freighters of ships, considered those who take vessels on freight or charter, as having only a qualified use of the ship, to wit, for the mere purpose of transporting their cargoes. But all advantages of salvage, I have supposed to belong to the owners of the vessel, who would be answerable to the freighters, if losses were incurred, without their assent to this extra-employment of the ship. If this opinion is controlled by the decision in the case of The Blaireau, I must yield to it. This will depend on its being a question decided for general direction, or only as it respects that particular case.

I have fixed the whole salvage at near two-fifths, following in a degree that case, though the amount saved was not proportionate to the risk, if that forms any rule. An accurate one cannot be established from this circumstance. I shall, where the amount is considerable, adhere to the rule taken in the case of The Belle Creole. My former mode of distributing among the own-

ers of the vessel and the crew. seems to be controlled by the case of The Blaireau. There one third was assigned to the owner, and two thirds to the salvors. I think in the spirit of that case, the risk of the owners, in this case, was more disproportionate to the amount saved. I therefore direct that one half the salvage be paid to the owners.

Out of the monies in court[2] (after deducting the sum decreed for salvage) the balance of wages due to the seamen of the Cato, to the time of their arrival at Philadelphia, will be paid. All the officers and seamen of the Cato will receive this balance. The half share, to those who actually saved the goods at the second meeting with the Cato, is an addition to wages to those persons whose adventures were not delivered to them, as before stated, free of salvage: If they pay salvage on their adventures, the half share must be paid to them. I believe these adventures, were among the articles saved at the first meeting with the Cato, and compose no part of the second salvage.

I do therefore adjudge, order and decree, that the libellants in this cause, have and recover in full satisfaction for and as salvage, the sum of fifteen hundred dollars.

This sum of fifteen hundred dollars was divided among the salvors by the decree, in the following manner. James Taylor, Isaac W. Norris and Larkin Milnor, the owners of the said brig Alexander, received one half of the said sum $750. The remaining half, was distributed amongst the master and crew of the brig Alexander, and Samuel Pyle master, and James Parlecatur boatswain of the ship Cato as follows, to wit:

| | |
|---|---|
| John Heartwell, master of the brig Alexander, received 8 shares, or...... | $300 00 |
| Thomas Newark, the mate, 4 shares, or ............................... | 150 00 |
| John Burkett, seaman, 1 share, or.... | 37 50 |
| Manuel Hers ........................ | 37 50 |
| Andrew Guniss ..................... | 37 50 |
| Charles Engram .................... | 37 50 |
| Antoin Frazer ..................... | 37 50 |
| Robert Williams, cook ............. | 37 50 |
| David Marshall, boy, one-half share.. | 18 75 |
| John Williams, boy ................ | 18 75 |
| Samuel Pyle, master of the ship Cato. | 18 75 |
| James Parlecatur, boatswain of said ship ............................ | 18 75 |

[2] This balance, as are all monies brought into court, was deposited in the bank of the United States. By a rule of the court, no monies are drawn from the bank but by a check, on which the order of the court is endorsed. In the case of The Belle Creole, the French crew were paid wages with part of the balance in bank. Ships and goods deserted, and found at sea, are national droits, if no owners appear. This is now law, and the old barbarous doctrines and practices as to these, wrecks, etc., are obsolete. See The Aquila, 1 C. Rob. Adm. 42, etc. The produce of ships and goods unclaimed (after payment of salvage) is, it should seem, also a national droit. But there should be, as in several maritime countries, some time, and that liberal, fixed for claims by owners.