## THE SANDRINGHAM.

*(District Court, E. D. Virginia. January 31, 1882.)*

1. ADMIRALTY PRACTICE—CONFLICTING TESTIMONY.

Where the testimony of the libellant and the ship's officers conflicts, and one of the officers of the ship is not examined on the points in dispute, that circumstance goes to the discredit of the ship's officers.

2. SAME—TESTIMONY OF EXPERIENCED MARINERS, GRADE OF—WEATHER REPORTS OF SIGNAL SERVICE.

The testimony of experienced mariners, of approved credibility, as to the character of the weather, and the practical effect of the wind and ocean swell, or other such facts occurring at sea under their own observation, is a higher and more reliable grade of evidence than the weather reports of the signal service from observations taken on land, and will be preferred by the court in passing upon such facts.

3. SALVAGE—ELEMENTS OF AMOUNT AWARDED.

The amount awarded as salvage comprises two elements, viz., adequate *remuneration* given by way of compensation according to the circumstances of each case; and a *bounty* given to the salvor for the purpose of encouraging similar exertions in future cases. The relative amounts of each of these elements given depend on the special facts and merits of each case.

4. SAME—INGREDIENTS OF SERVICE.

In addition to the six main ingredients of which a salvage service is composed, as announced in the case of *The Blackwall*, 10 Wall. 1, the court will take into view, as an important consideration, the degree of success achieved, and the proportions of value lost and saved; and will award a higher proportion, even on large values, in cases where both ship and cargo are saved with substantially slight injury, than in cases where only the ship or only the cargo, or only portions of it, are saved.

5. SAME—AWARD OF—WHAT INCLUDED IN ESTIMATE OF VALUE.

A ship on a voyage from Galveston to Liverpool was wrecked at the Virginia capes. Both ship and cargo were saved by salvors, and enabled to complete the voyage. One-half the gross freight to be earned on arriving at Liverpool was included by the court in estimating the value of the property saved.

6. SAME—ONE-FOURTH COMBINED VALUE OF VESSEL AND CARGO AND HALF OF FREIGHT AWARDED.

A steamer worth, with her cargo and freight, $200,000, was stranded on Cape Henry, within 100 yards of the shore, where the currents of the Chesapeake bay, encountering those of the ocean, are often very dangerous. Salvors, with a large force of vessels, wrecking apparatus, and men, after a week of hard and dangerous labor, in which the highest degree of skill was shown, succeeded in getting off both vessel and cargo so successfully as to allow them to proceed on their voyage after repairs to the ship. One-fourth of the combined value of the vessel and cargo, and of half the freight, was awarded as salvage.

In Admiralty.

*Sharp & Hughes*, for libellant.

*Walke & Old*, for respondents.

HUGHES, D. J. On the evening of Friday, November 5, 1880, the iron steam-ship, Sandringham, of Glasgow, 1,159 tons, McKay, master, at about 7 P. M. was beached some three-quarters of a mile south of Cape Henry light-house. She was loaded with 3,000 bales of compressed cotton, and a complement of flour and manganese. She had cleared at Galveston, and was bound for Liverpool. She had first struck on the outer reef or sand-bar which stretches along, and parallel with, and about 300 yards distant from, the shore; but, passing over that, she then struck the main shore at a point some 50 or 75 yards out from low-water mark, where she stranded in the sand and was unable to get off. There was at the time a heavy fog, but the light at Cape Henry could be seen, and had been seen at intervals previously to the stranding of the ship. Capt. McKay says that "the grounding was occasioned because of a heavy fog, a heavy swell of the ocean from the eastward, and because there was no pilot on board, and he himself was ignorant of the nature of the coast."

At 7 deg. 40 min. life-boats from the government's life-saving station at Cape Henry came along-side and the captain went on shore. The ship was then striking heavily at intervals against the ground, and continued to do so during the night and nearly all of next day. After coming ashore the captain telegraphed to Norfolk for assistance. The ship was taking water all night, and the pumps were kept going and the hold-sluice left open. Some time after midnight on Saturday morning, the 6th, the ship was still striking heavily upon the ground, making water, and lying on her starboard bilge. A heavy swell was running in and breaking over her forepart. At 4 A. M. she lay quiet, but her pumps were kept constantly going. At 7 A. M. she began to strike and strain heavily aft. At noon the captain returned from the shore in a life-boat. At 2 P. M. he received a telegram from the life-saving station announcing that a storm was threatened, and advising him to land his crew and their personal effects. After 4 P. M. the crew were, in the course of time, all landed; the chronometer also was sent ashore; but the master, first mate, and engineer remained aboard a while longer. At 6 P. M., or about that time, the wrecking officer and wrecking gang of the libellant came on board and took charge of the ship. After the ship's crew had gone ashore the captain asked the wrecking officer on board (Capt. Nelson) whether the wrecking surf-boats were sufficient to save himself and officers as well as the wrecking gang, and was answered in the negative; the

reason assigned being that the surf-boats were only of size sufficient for the wrecking men. The ship's engineer, Watson, who had banked his fires and locked his engine-room, also inquired of Capt. Nelson whether, if anything happened from the storm during the night, he himself could be taken in the surf-boats, and received a like answer in the negative.* Thereupon Capt. McKay, Watson, and the first officer went ashore on the rocket apparatus of the life-saving station.

Capt. McKay testifies that he left his nautical instruments, books, charts, and the clothing of himself, the engineer and others on board.

Most of the foregoing facts are taken from the log-book of the Sandringham, and from the depositions of her officers given in this cause.

When the master first went ashore, on the night of the fifth of November, he telegraphed to the house of William Lamb & Co., at Norfolk, asking for assistance, and requesting the firm to make the best arrangements practicable for saving the vessel and cargo.

Except at Norfolk no assistance was available short of Baltimore or the Delaware, and the weather, fog, and distances were such that efficient aid with sufficiently powerful steam-tugs could not from these quarters have been procured by any possibility, within 24 hours. Indeed, it is not shown by the evidence that any adequately constituted, equipped, and furnished wrecking fleet existed at all south of New York, except that of the libellant.

I think it is absolutely shown that if the saving of this ship and cargo could only have been effected by a wrecking fleet of stout steamers, tugs, schooners, and surf-boats, completely manned and equipped, that of the libellant was the only fleet available at the time for this enterprise, or existing at all on the south Atlantic sea-board. Accordingly, the Messrs. Lamb & Co. at once engaged with the libellant for this salvage service. Capt. McKay says in his deposition:

"Having received a telegram from Lamb & Co. to the effect that the arrangement of salvage was left to arbitration, on meeting those captains (Capts. Nelson and Orrin Baker, of the wrecking fleet, at about 11 A. M. on the 6th) I mentioned that circumstance to them, and told them to commence operations at once on that understanding."

The testimony in the case proves that what the captain says about "arbitration" was not true. All the witnesses of the libellant who testified on the subject concur in stating that nothing was said about arbitration, and the claimant does not adduce a single witness to cor-

*Capt. Nelson testifies that his answer was that he could not take the baggage, but would take the officers.

roborate Capt. McKay's assertion. The simple fact was that a salvage service was undertaken, without any contract or definite understanding as to the compensation or the mode of ascertaining the amount of it.

The libellant, Capt. Joseph Baker, on being called upon by Col. William Lamb, the head of the firm of Lamb & Co., at once began preparations for the relief of the stranded ship; and the steam-tug Nettie, Capt. Cole, with large anchors and cable, with an outfit of other wrecking apparatus on board, set out from Norfolk for Cape Henry about midnight of the 5th. Owing to the heavy fog she did not pass Fortress Monroe (13 miles from Norfolk) till day-light of Saturday, the 6th. When abreast of the fortress she met the wrecking steamer B. & J. Baker, also belonging to the libellant, Capt. Orrin Baker, master, which was on her return from another wrecking enterprise, having on board a considerable outfit of wrecking material, including a very large anchor of 4,500 pounds weight. It had also on board a wrecking gang under Capt. Nelson. The Baker at once joined the Nettie, and both proceeded to the vicinity of the Sandringham, which lay about 17 miles from Fortress Monroe and 30 miles from Norfolk. Between the hours of 10 and 11 A. M. of Saturday, the 6th, they arrived near the steamship, and Capts. Nelson and Orrin Baker went aboard her. After making slight examination they went ashore, where they saw Capt. McKay, and were directed by him to go to work to save the ship; no terms being mentioned in the interview. They at once thereupon returned to the wrecking steamers, and proceeded to lay their two largest anchors some distance beyond the outer reef, planting one anchor out beyond the other, and connecting the two by a chain. To the inner anchor they attached their cable, and then laid the cable to the Sandringham. The distances were nearly as follows: From low-water mark on shore to the ship, between 50 and 75 yards; from the ship to the outer reef and line of breakers, about 150 yards; the breakers were about 100 to 150 yards wide; the two anchors were well out beyond the outer line of the breakers.

During the wrecking operations the wrecking steamer B. & J. Baker lay for the most of the time about 1,000 yards beyond the ship; other wrecking vessels 150 yards and more beyond the breakers. Having planted the anchors beyond the outer reef and breakers, Capt. Nelson, who had charge of the wrecking gang which was to operate on board the Sandringham, came along-side the ship in a surf-boat, with his cable, at about 4 P. M., and called to those on board for a line

with which to haul his cable on deck; but none was thrown him. He thereupon climbed on board and found the crew preparing to go ashore with their baggage. On being asked by the second mate if he intended to take charge, he answered yes, and asked for help to haul the cable up. The second mate replied that they had all stopped work and were going ashore.

By failing to receive the prompt assistance he counted on, Nelson's line got fouled with the propeller of the ship. This accident made it necessary to return outside for a grappling hook with which to fish up the cable, which he succeeded in doing, and in getting his cable aboard the ship by about 6 P. M. There was much wind and swell. The crew, as before stated, had then left the ship, and were followed shortly afterwards by the officers, who left their ship by the rocket line of the life-saving station for personal safety from a coming storm.

The log-book of the Sandringham, speaking of the sixth of November, says:

"After the wrecking crew came aboard, the ship driving up the beach all the time. Six P. M., set cables tight, (meaning the wreckers' anchor cables.) Master and myself went ashore on the rocket apparatus. Weather looking bad and storm signal flying on the life-boat station. A strong breeze from the south-east, with a heavy swell running in."

The Sandringham then lay at an angle of about 45 deg. with the beach, heading northerly, with her port side to land. She lay upon a beach of fine movable sand, which would be rapidly cut out from under the ship by the strong currents and heavy ocean swells which run more or less continually at Cape Henry. She now careened considerably on her starboard side, in consequence of the strong current from the eastward which had been running since she stranded.

She was a propeller, and an iron-compartment ship, with five compartments; and she had a ballast tank in her hold of 100 tons capacity, which was then filled with water. She had a visible leakage around her stern gland, and had taken in several feet of water aft, which the pumps, though kept active, did not effectively reduce. The testimony of the libellant is that there was as much as six or seven feet of water in the hold when the wrecking officers, Capts. Nelson and Orrin Baker, first came to the ship about 11 A. M. on the 6th. Just previously to seeing her master on shore, they, in company with the first mate of the Sandringham, proceeded to ascertain the extent of the leakage below, and found that the water was from six to seven feet deep in the shaft-alley and engine-room, and all the

way from the bulk-head aft; with the rear compartment leaking near the stern post. The defence did not call the first mate to contradict this statement. There was no diminution of water between 11 A. M. and 6 P. M. on that day.

When the wreckers first took charge, at 6 P. M. of the 6th, the ship had sunk about seven feet in the sand, though some of the ship's crew insist in their testimony that the depth was not more than four feet. In either case, the sequel showed that it was wholly beyond the power of steam-tugs, in any number, and of any capacity, to draw the ship off the beach as she lay at the hour last named, and no expedient was left for saving her except to lighten her of part of her cargo, to pump out the ballast tank, to reduce the amount of water in her hold, and to gradually draw her out of the sand by heaving upon the cable attached to anchors planted out in the main, whenever the tide favored. With all their exertions they did not actually move the ship for five days. When the officers and crew of the Sandringham left their ship on the evening of the sixth of November, as has been stated, her master had himself despaired of being able, with the ship's crew and instrumentalities, to save her. Although he had cables, anchors, and boats for planting them, he did not attempt at any time on the 6th to save his ship by the means which the wreckers employed afterwards with success. He states that the weather and the ocean swells were too severe for this. Whether or not at the time of leaving the vessel on the rocket apparatus of the life-savers, on the evening of the 6th, the master and his officers had any expectation or intention of returning at all, does not conclusively appear. It is certain that the master on that night, seeking personal safety on land, abandoned the ship in the face of danger absolutely to the wreckers, and did not offer or attempt to resume authority over her until after she had been safely brought into harbor a week afterwards.

The ship, having survived the severe weather of the night of the 6th, and the weather and the sea having considerably abated by next day, Capt. McKay and his crew returned to the ship on the 7th, and resumed the occupancy of their respective quarters on board. But they gave no assistance in the wrecking operations at any stage of them, except that the engineer and firemen worked the ship's donkey-engine and winches in heaving upon the cable; and this, although the wrecking enterprise went on laboriously from the night of the 6th to the night of the 13th, when the ship was brought into harbor.

There is some contradiction in the evidence as to whether or not the bed on which the ship lay after she was beached was a *quicksand.* Admiral Smyth, in his Dictionary of Nautical Terms, defines this to be "a fine-grained, loose sand, into which a ship sinks by her own weight as soon as the water retreats from her bottom." It is immaterial what name we apply to the sand off Cape Henry. The fact is that there, and all along the coast southward for several hundred miles, the sand is a fine, movable substance, which, when a heavy body is resting upon it, retreats from under it by the action of the currents of the ocean which there constantly prevail, leaving a bed into which the body sinks deeper and deeper the longer it remains in the position. There is no possibility of any substance, which, in specific gravity is too heavy to float upon the surface of the water, being lifted out of its bed in this sand and floated upon the shore. All the vessels that are beached upon the sands of this long coast invariably continue to sink, deeper and deeper, until they disappear from sight under the sea into the sand.

The fate of the United States steam-ship Huron, wrecked off Kitty Hawk, November 27, 1876, was a notable historical exemplification of this characteristic of the sands of this part of the coast.

When the wreckers took charge of the ship at 6 P. M. on the evening of the 6th, and with their cable took hold of her aft, and began to heave upon the cable attached to the anchors planted outside the breakers, they checked the wallowing and sinking process; but the ship had been there nearly 24 hours on the beach, and had already sunk some seven feet into the sand. The wrecking company consisted of the libellant, who remained in Norfolk to forward promptly whatever might be needed at the wreck; Capt. Stoddard, who had the general direction of the wrecking operations, and who remained most of the time on the B. & J. Baker; Capt. Nelson, who had charge of the work on board the Sandringham; Capt. Orrin Baker, master of the wrecking steamer B. & J. Baker; Capt. Oakley, of the steam-tug Mollie Wentz; and 80 or more other persons, composing the crews of the several vessels employed, and embracing the wrecking hands, a gang of about 30 of whom operated on the ship. Besides the vessels already named, the tugs Spring Garden and G. W. Roper, the wrecking schooners Henrietta, Joseph Allen, and Annie Clark, three surf-boats, and the lighter Neptune, were engaged in the enterprise.

The plan of operations was to heave on the cable and take advantage of every tide to draw the ship off the sand-beach; to lighten her by taking off cotton, and shipping the bales on tugs and schooners to Norfolk; to keep down the leakage by active pumping; and to pump out the great weight of water in the ballast tank.

There were rough weather and strong ocean swells during four or five of the several days during which the work was going on, which made it necessary to pass the cotton from the deck over the port side of the ship, which was considerably *listed* upon her starboard side, to let it down into surf-boats run under her port side, and to carry it in these surf-boats across the breakers to the steamers and schooners outside. The weather and swell of the ocean were such during these days that these steamers and schooners could not come inside of the breakers without great danger. The work was the more tedious because it could not go on at night. Capt. Nelson says in his testimony:

"There was a line of breakers outside of where the ship was lying, from 100 to 150 yards wide, where it is dangerous to cross during the day; and therefore I wouldn't undertake to do such things at night. I was satisfied the [surf] boats would swamp if I did undertake it, and therefore I wouldn't run the risk of losing boats and men's lives. We couldn't work on the ship [at night] for the reason we couldn't see how to work in lowering cargo into the boats, and couldn't have lights in the hold of the ship loaded with cotton."

The weather was at times such that the vessels receiving cotton from the surf-boats found it necessary to put into Lynhaven bay at night. The surf-boats were pulled out across the breakers by their crews taking hold of a lead-line that was stretched from the ship to the vessel receiving the cotton outside. Occasionally they were rowed out when the weather would permit. The surf-boats were rowed back by their crews, and were towed, on one day by a tug, out to the windward from the receiving vessels, in order to give them a fair wind to return to the Sandringham by rowing. Owing to the danger attending the lifting of the bales over the port side of the ship and letting them down into the open boats tossed on the waves below, and the small number of bales that could be carried in each boat, the process of saving the cotton was slow and tedious; but there were saved in this manner on the seventh, eighth, ninth, and eleventh of November an aggregate of 573 bales.

It was fortunate for the ship that the wreckers succeeded in making fast their cable to her aft port before night on the 6th, the night

of the first storm which she encountered on the beach. By keeping a taut cable that night by means of the capstan and rope and pullies, they probably saved her from sinking hopelessly into the sand. By continuing to heave upon the cable afterwards, they gradually, after a few days, brought her stern around until she had attained a position approximately at right angles with the shore, across the course of the currents that run along the beach. When their hawser was first made fast, the ship was lying within 75 yards of low-water mark, and 150 yards inside the outer reef, and of the line of breakers 100 to 150 yards wide beyond.

On Saturday, the 6th, and every day afterwards until Friday, the 12th, the sea was too rough for any of the wrecking steamers or schooners to come along-side of the Sandringham; either because of rough weather or of the ocean swells that prevailed. Up to the night of the tenth of November no success had attended the efforts of the wreckers to pull the ship from her position on the beach. On that night she encountered a second storm, a heavy wind and sea striking her from the south-east at 11 P. M. In consequence of the current then cutting the sand from under her port side, she took a considerable list towards the shore, and was in danger throughout the night of going over on her beam ends. The wreckers had to apply themselves with great energy and determination to the task of breaking up the cotton between decks, and moving it from the lower or port to the starboard side of the ship, in order to keep her from capsizing. By dint of hard work, continued through most of the night, they succeeded in sufficiently righting the ship to save her from the danger of capsizing. The weather had been more or less rough all day on the 10th, so that no cotton could be taken out of the ship even in surf-boats. On the 11th it had sufficiently moderated to admit of the resumption of operation with the surf-boats. On the 12th the sea was smooth enough for the wrecking schooners and steamers to come along-side the ship, so that on that day as many as 476 bales were put off, or nearly as many as had been saved in the whole period of five days preceding in surf-boats.

By the night of the 12th the whole quantity of cotton which had been removed amounted to 1,049 bales, which, the leakage having been stopped and the ballast tank having been emptied, so lightened the ship as to give strong hope of getting her afloat. The 1,049 bales of cotton which were removed from the ship were all taken either from the upper deck or from between-decks. It is not true, as the

second mate of the ship testified, that 1,000 bales were taken from the lower hold. It is true that something less than 50 bales were taken from the hold for the purpose of making room for a pump that was intended to be put in there by the wreckers; but some of these bales were put back, and only the rest sent off the ship. The cause of the *listing* of the ship on the night of the 10th, from the starboard to the port side, was not the removal of 1,000 bales of cotton from the hold to the deck, as the second mate testified, but was the change of the current, which then cut the sand from under the port bilge of the ship, instead of the starboard bilge, as it had previously done. The ship was first got out from her original position on the 11th, when she was moved about 30 feet. On the 12th she was moved 10 feet, and on the morning of the 13th, 50 feet.* It has already been stated that this was done by heaving on the cable with the ship's winches, worked by the ship's engines, engineer, and firemen, under the direction of Capt. Nelson. About 8 P. M. on the 13th the ship was finally got afloat, and was pulled out into deep water beyond the breakers by a tow from the steamer B. & J. Baker, aided by her own engines, which had been fired up. Her tow line was then cast off, and she steamed into Norfolk harbor under the command of Capt. Stoddard, arriving there about midnight.

It was fortunate that she was got afloat just when she was, for she thereby escaped by half an hour a heavy wind and swell from northeastwardly that then set in; that particular swell lasting several days after the wind had sunk to four miles an hour.

In the saving of the Sandringham and her cargo there was no lack at any stage of the undertaking of men or vessels or material in any particular, and the enterprise was thoroughly successful; the ship having been brought safely into port so little injured that she soon afterwards steamed off to Baltimore for repairs, and not a bale of cotton having been lost.

So unusual and unexampled was the success of this enterprise that it naturally suggests the question whether the fortunate result was owing to the skill of the men in charge, or to the mildness of the weather, the moderation of the sea, and the absence of risk and danger in the wrecking operations.

---

*These figures are taken from the log-book, which is not evidence against the libellant. I suppose they are a slip of the pen, and that *yards* or *fathoms* were intended. Libellant's witnesses make the distances greater than if the log-book meant feet.

In regard to the first question, it may be safely stated that the wrecking officers who conducted this enterprise were men of extraordinary skill and experience in the business of wrecking; and that they were furnished on this occasion liberally and promptly with every appliance that was requisite for this work. The libellant is a wrecker by profession and of a life-time's experience. He had at command at the time of the salvage under consideration, as the creation of a heavy outlay of capital, estimated by some of the witnesses in this cause at as much as $100,000, a complete outfit of wrecking vessels, implements, and material.

*Per contra,* it is shown by an inventory of the prices at which these various articles were valued to the Baker Wrecking Company, on a recent occasion, that the aggregate proceeds of sale of the larger part of them was only $25,575. The libellant contends, however, that the lowness of these prices was owing to the absence of competition for such property, in consequence of the general discontinuance of the wrecking business that has taken place on the Atlantic seaboard, from which cause the prices were but nominal, and far below the original cost of the articles inventoried. He contends, also, that this sort of property is peculiarly liable to waste, detoriation, and loss; and always sells, at second hand, at great sacrifice. Be this as it may, the fact remains that the libellant's assortment and outfit of wrecking vessels, apparatus, implements, appliances, and supplies of all kinds was very large.

Capt. Baker had been long at the head of the principal wrecking company of the Atlantic sea-board; is reputed one of the most experienced and successful wreckers of his day; and his establishment was, at the time of this service, the only one south of New York that had survived the evil fortunes that have for a long period beset the wrecking business on this coast. The earnings of his firm in a period of 10 years had amounted to the aggregage sum of $811,425; and his outlays during this period were $700,000; to which must be added the loss and depreciation of stock in the wrecking business. Capt. Stoddard had been a partner, but was not so in November, 1880, and engaged in this special enterprise on a special agreement. His compensation was only $10 a day; but the libellant was in debt to him, and he hoped to make his debt good.

By reputation Capt. Stoddard is probably the best wrecker on the southern Atlantic coast. He has followed the sea the greater part of his life, and has been engaged in the business of wrecking, as a pro-

fession, for many years. He has had more experience in the business than any man on this coast, except Capt. Baker, and is still in the vigor of manhood.

Capt. Nelson, Capt. Cole, and Capt. Orrin Baker are also wreckers of many years' practical experience, and of the highest repute in the profession. These are all men of high personal character, and good standing as members of society. They operate as wreckers along the whole Atlantic coast of the United States south of New York, and are sent for from far and near.

The crews of the wrecking vessels were employed by the year. This insured familiarity with their duties, but did not insure the extraordinary exertion which is inspired by the lively expectation of the extraordinary rewards of salvage services. It is quite probable, as is contended by the defence, that some of the working gang who were employed in this enterprise were of the class of common laborers, who were without special experience in the wrecking business, and were paid but ordinary wages. Yet, on the whole, the evidence in this case establishes the conviction that if success in a wrecking enterprise could be insured by large experience, approved skill, and perfect appointments, this particular enterprise had the benefit of all these conditions of assured success in a high degree.

On the question whether the weather and sea were such as to render the service of the wreckers in this enterprise one of risk, danger, and difficulty, there is some contradiction in the evidence in the case.

There was undoubtedly a storm on the night of the 6th which put the ship in great peril, and which would in all probability have caused her to bilge and break up, and possibly to have sunk in the sand hopelessly beyond recovery, but for the wreckers having planted their anchors and made fast their cable to her on the afternoon before. There was undoubtedly another storm on the night of the 10th, which, by the changed action of the current upon the sand-bed under her, nearly capsized the ship; and would have done so, but for the hard work performed by the wreckers on board in breaking up the cotton between-decks and shifting it from the lower to the upper side of the careened vessel. On both occasions the ship was in great danger and peril, and was rescued from them by the exertions of the wreckers. The surf-boating of the cotton was undoubtedly rendered necessary, during the intervals between the storms, by the rugged condition both of the weather and the sea.

Though denied by McKay, the engineer Watson, and second mate, it must have been true that there was no time between the

night of the 6th and the morning of the 12th in which the wrecking vessels could safely have come inside of the breakers, and lain alongside of the ship and taken cotton from her. The same condition of the weather and sea made the process of delivering the bales of cotton from the listed ship into the surf-boats, and conveying them many hundred yards across a wide line of breakers, a work of danger, both to life and to property, requiring for its avoidance much skill and care. It is difficult to read the whole evidence in this case and then to question these facts as to the two storms, and as to the work of the surf-boats.

Three of the witnesses for the ship discredit their own testimony by statements signally untrue, and I have no choice but to reject it when it is in conflict with the evidence of the wrecking officers; and their testimony is the more open to distrust from the fact that the first mate of the ship was not examined on the principal points in dispute.

Although the reports of the weather and sea-swells made at the signal office at Cape Henry do not show during the whole period of this service as bad a condition of weather and sea as was testified to by the wrecking officers, still it is probable that this partial conflict of testimony is more apparent than real. On that part of the coast the wind and sea-swells are not necessarily simultaneous. It is well known that often there are high winds without much swell, and, on the other hand, heavy swells in fine weather. That the reports from the signal station at Cape Henry, put in evidence by the defence, do not in some respects correspond with the testimony of mariners, speaking from their personal experience, is doubtless owing partly to the fact that the observations at the signal station are made only seven times in 24 hours, at a point on the coast where the changes of wind and current are frequent and sudden; partly to the fact that they are made by theoretical men on shore, whose position is essentially different from that of practical seamen actually encountering the elements out upon the waters; and partly to the fact that the nomenclature of the signal service, which is purely scientific and arbitrary, differs from that of seamen, which is conventional.

For instance, the men of the signal station say that the wind is not "high" until it blows at the rate of 35 miles an hour; is not a "gale" until it attains a velocity of 45 miles; and does not become a "storm" until it exceeds the rate of 50 miles an hour. Mariners, however, who buffet the winds, use a nomenclature which refers to sensible effects rather than to mathematical precision, and to veloci-

ties apparently as great but often much less than are indicated by scientific instruments. There is accordingly observable, in some of the testimony taken in this case, a discrepancy between scientific reports of winds and swells at Cape Henry, made from instrumental observations taken on shore, and the statements of seamen who were engaged in the vessels and surf-boats outside. And, as I am under the necessity of passing upon the relative value of this testimony, I am free to say that I am not inclined to repose entire confidence in the reports of the officers of the signal service as to facts out at sea, when they conflict with testimony of experienced and credible seamen. Indeed, these reports cannot be received between parties to a litigation as evidence in the strict legal sense. They lack the two sanctions necessary to the validity of legal testimony, viz., that of being given on oath, and that of being subjected to the opportunity of cross-examination.

The courts are doubtless at liberty to take judicial notice of these reports as historical minutes of the course of natural events; but they certainly are not bound, and perhaps not at liberty, to give full credence to them in prejudice to the interests of litigants, when contradicted by the testimony of practical mariners of unquestioned credibility. The depositions of experienced mariners as to events of which they have practical knowledge, given on oath and under cross-examination, is certainly a higher grade of evidence than such reports; and where the witnesses are well known and enjoy a character beyond impeachment, it must be preferred. No doubt the scientific reports are true, mathematically, as of the isolated points of time and place to which they refer; yet all naked mathematical facts occurring in the course of nature are more or less modified by circumstances which do not appear in the barren scientific minutes which record their occurrence. If a surf-boat crossing dangerous breakers in a high wind on a sea-swell is suddenly caught up and capsized, the property on board lost, and the men drowned, the collision of elements which actually did occur, and did produce the catastrophe, may not be denied to have occurred on the faith of a minute taken an hour or two before or afterwards, at the nearest signal station on shore, showing that the wind was the time not blowing a "gale," but only at the rate of 44 miles an hour, and that the swell was "light southeast."

A swell that is light along the shore may produce angry, roaring, engulfing breakers out on a reef but a few hundred yards off. If the witness to nautical facts be an intelligent person of experience and

approved credibility, a court of law must believe what he says under oath and under cross-examination, concerning facts which have occurred within his own knowledge, in preference to the isolated minutes of an officer who was not on oath and was not cross-examined as to any of the explanatory circumstances which may have existed at the time. Yet I am free to admit that these minutes often afford to a court invaluable assistance in correcting extravagances of statement on the part of ignorant or unscrupulous witnesses.

The values agreed upon for the property saved are:

For the ship, valued in Baltimore, - - - - - $ 36,000
For the cargo, - - - - - - - 150,000
For the freight from Galveston to Liverpool, - - - 14,000
                                                    _____
                                                    $200,000

After the ship was valued repairs were put upon her which cost $13,677.59.

### THE LEGAL FEATURES OF THE CASE.

To the case whose leading facts have thus been recited I am now to apply the principles of the law of salvage, and ascertain by their guidance the amount of money to be awarded for the successful service which has been described. Although it is true that this amount lies within the discretion of the judge, yet he is not at liberty to render an arbitrary judgment at his own individual discretion or caprice,—a *rusticum judicium,*—but must be governed in his award by the teachings of precedents and the recognized principles of the law of salvage. That this is a case of salvage—that is to say, a case for *bounty* as well as *wages*—is conceded by the respondent, who admits that one-tenth of the value saved would not be an undue compensation. The libellant claims *half*, and my own duty is simply that of determining the amount of compensation to be awarded. Being a case of salvage, it is not one of mere wages, *pro opere et labore*, nor a case of *quantum meruit*, in the sense that the work is to be paid for in an amount ascertained by applying the ordinary rules of remuneration for personal services; but it is a salvage claim for services which could not have been compensated at all except in the event of success, and which not only embraces *wages* for the work and labor done, and *adequate remuneration* for outlays of time, labor, and means according to their actual value, but also embraces a *reward* for having rescued property from the peril of the sea, under circumstances of risk and danger to the salvor and his property, and in the face of the contingency of get-

ting nothing at all in the event of failure; a *reward* so liberal as not only to satisfy such reasonable expectation of extraordinary compensation as prompted this particular adventure, but also to serve as an inducement to like exertion by salvors in future cases of peril and doubtful success.

Chief Justice Marshall alluded instructively to the policy of the law of salvage in the case of *The Blaireau*, 2 Cranch, 266, in the following terms:

"If the property of an individual on land ·be exposed to the greatest peril, and be saved by the voluntary exertions of any person whatever; if valuable goods be rescued from a house in flames, at the imminent hazard of life, by the salvor,—no remuneration in the shape of salvage is allowed. The act is highly meritorious, and the service is as great as if rendered at sea; yet the claim for salvage could not, perhaps, be supported. It is certainly not made. Let precisely the same service, at precisely the same hazard, be rendered at sea, and a very ample reward will be bestowed in the courts of justice. If we search for the motives producing this apparent prodigality in rewarding services rendered at sea, we shall find them in a liberal and enlarged policy. The allowance of a very ample compensation for these services, one very much exceeding the mere risk encountered and labor employed in effecting them, is intended as an inducement to render them, which it is for the public interests, and for the general interests of humanity, to hold forth to those who navigate the ocean."

In the case of *The Henry Eubank*, 1 Sumn. 400, Judge Story gave expression to similar views:

"The law does not stop short with a mere allowance to the owner of an adequate indemnity for the risk so taken. It has a more enlarged policy and a higher aim. It looks to the common safety and interest of the whole commercial world in cases of this nature; and it bestows upon the owner a liberal bounty to stimulate him to a just zeal in the common cause, and not to clog his voyages with narrow instructions which should interdict his master from salvage service. * * * The law offers not a premium of indemnity only, but an ample reward, measured by an enlightened liberality and forecast."

Of course this liberal policy of the courts thus announced must not be abused to the extent of encouraging or ministering to a spirit of avarice and greed. Another American jurist of the early part of our century, Judge Hopkinson, in the case of *The Elvira*, Gilpin, 60, says that to a just and fair remuneration for the labor, hazard, and expense which a salvor has encountered—

"The court, governed by a liberal policy, will add a reasonable encouragement, which the generous and humane will hardly need, to prompt men to exertions to relieve their fellow-men in danger and distress. But we must remember that the policy of the law is not to provoke or satisfy the appetite

of avarice, but to hold out an inducement to such as require it, to make extraordinary efforts to save those who may be encompassed by perils beyond their own strength to subdue."

Salvage, therefore, is a reward or bounty, exceeding the actual value of their services, given to those by means of whose labor, intrepidity, and perseverance a ship or her goods have been saved from shipwreck or other dangers of the sea. 1 Bell, Com. 592. How to give such recompense as may fairly reward the labor, intrepidity, and perseverance of salvors, and encourage them to exertion and honesty in relieving ships, goods, and persons in danger, and at the same time to prevent excessive exactions in the moment of alarm, is a difficult problem; and a court must deal with each case before it according to its own particular circumstances, and with reference to the liberal aims of the law as explained by the jurists whose expressions have been quoted. It may be laid down as a cardinal principle of salvage that the rate of compensation to be allowed in any case must not only contemplate the labor and exertion and danger attending the particular enterprise, but must be so liberal, if the condition of the fund at disposal permit, as to attract public attention; the court looking not merely to the exact *quantum* of service performed and its actual value, but to the general interests of navigation and commerce, which depend for protection upon services of this character.

I have emphasized this latter feature of the policy of the law of salvage, because there is a growing complaint among wreckers and salvors that the admiralty courts of our Atlantic coast, more particularly those of New York, have until quite recently been disposed for a long time to ignore it in their awards of salvage, and to confine themselves too much to the *quantum meruit* view of the value of salvage services. Whether the policy of the courts has been too restricted or not in this respect is not for me to say; but the fact is, whether resulting from this or other causes, that almost every wrecking company which has operated along the Atlantic seaboard in the last 50 years has ceased to exist.

In this country we have no legislation having for its object the encouragement of salvors, like the merchants' shipping act of Great Britain, 17 & 18 Vict. c. 4, §§ 458 *et seq.;* and the duty of affording this encouragement devolves upon the admiralty courts; and I think it is generally conceded that unless these courts are more liberal in their awards of salvage than they were for a considerable period until recently, the business of wrecking as an organized pursuit, conducted by reputable men, will soon be wholly abandoned. Certainly, if it be

the policy of the law and of humanity for the courts to encourage by liberal bounties the rendering of aid to persons and property in peril at sea, that encouragement ought not to be doled out so illiberally as to destroy all organized and reputable wrecking companies on our sea-board.

I do not propose in the case at bar, however, to make any violent departure from the policy of our American decisions. I think a more liberal policy has already been inaugurated in most of our courts, especially by the supreme court of the United States; its decisions in the cases of *The Camanche*, 8 Wall. 448, and *The Blackwall*, 10 Wall. 1, being conspicuous pioneers in the line of a liberal policy.

The recent cases in the English high court of admiralty of *The Hebe*, L. R. 4 Pro. Div. 217, and of *The Craigs*, L. R. 5 Pro. Div. 186, indicate a liberalized policy in England also.

The leading considerations to be observed in determining the proportion or amount of an award for salvage service are well defined. I do not know where they are more explicitly stated than in the instructions given in 1865 by the British board of trade to the receivers of wrecks of Great Britain. Embodying the result of the decisions of the English and American courts of admiralty, the board of trade then laid them down as follows. We are to consider:

(1) The degree of danger from which the lives or property are rescued.
(2) The value of the property saved.
(3) The risk incurred by the salvors.
(4) The value of the property employed by the salvor, in the wrecking enterprise, and the danger to which it was exposed.
(5) The skill shown in rendering the service
(6) The time and labor occupied.

These are the ingredients which must enter, each to a greater or less degree, as a *sine qua non* into every true salvage service; and to these I will add, not as an ingredient so much as a consideration to be taken into view:

(7) The degree of success achieved, and the proportions of value lost and saved.

Employing the language of well-settled law, the board, in the same instructions, among other things, say:

"In estimating the degree of danger regard should be had to the damage sustained by the vessel itself, the nature of the locality from which she was rescued, the season of the year when the services were rendered, and, if the

weather at the time was not tempestuous, the probability of its becoming so, and the ignorance or knowledge, as the case may be, of the master or other person on board the vessel."

With these points in view, I will comment briefly upon the case of the Sandringham.

1. That the ship was in imminent danger, at several periods of the work of saving her, is perfectly plain. Her master, Capt. McKay, had utterly despaired of saving her himself. She had beached at 5 P. M. on the fifth of November. He had left her two hours afterwards to call for help, and did not return until 12 M. the next day. During the early morning of the 6th, when it may have been practicable for him to lay his anchors outside by using the ship's boats, and to have taken measures for pulling her off the beach with a cable, as was actually done in the sequel, he failed to make the effort, and did nothing during the 24 hours after the ship had beached, even to prevent her from thumping against the ground. In fact, he did nothing at all for 24 hours, for the help of the ship, except to keep the pumps going part of the time. It is abundantly proved that when the wreckers took charge, whatever might have been the case before, the ship was too deep in the sand, and had too much water in her hold and in the ballast tank, and too much avoirdupois of cargo on her decks, to be got off the beach by tugs or tows of any degree of power.

There was no recourse but to plant anchors out beyond the breakers to lay a cable to them from the ship to lighten her of the burden upon her, and then to pull her off shore—none of which her own master and crew were capable of doing.

The result shows that this course had become indispensable at 6 P. M. on the 6th, when the wreckers took charge; for with all their extraordinary force of men, material, and machinery the wreckers were unable for five days of lightering the ship, and of constant heaving on the cable, to wrench the ship out from the dangerous sand-bed in which Capt. McKay left her; and, even on the fifth day, they succeeded in moving her, according to the log-book, only 30 feet.* That the condition of ship and cargo was hopeless without the aid of the wreckers, is shown by her master's failure to do anything for her relief for 24 hours after the beaching; by his earnest calls for help from Norfolk; and by leaving his ship with her crew to seek personal safety, apparently in despair of her, 24 hours after the

*See note on page 565, where it is conjectured that the second mate meant yards or fathoms when he wrote feet in the log-book.

beaching, without expressing any intention to return; indeed, it is self-confessed. The ship was in so great danger during the night after this abandonment, (the night of the 6th,) from the storm that came on, that it is not unreasonable to conclude that she would have bilged and broken up, so that it would have been necessary to have removed her cargo by gunpowder, if the wreckers, fortunately getting a hold on her with their cable at 6 p. m., had not stood manfully by her all through the night, holding her firm with their cable, made taut by means of the capstan, and by means of rope and tackle; for they were unable to use the ship's engines on the winches by reason that the ship's engineer had banked his fires and locked the engine-room before going on shore. Moreover, the ship was not only in this immediate danger of hopeless wreck, but there was no help within reach, which would have been at all adequate to the emergency, except that which was furnished with promptness and amplitude by this defendant.

The ship was again in equal danger on the night of the 10th, and was a second time saved by the stout efforts of these wreckers. Still again, on the 13th, when she had been finally got afloat by efforts exceptionally judicious, skilful, and successful, she escaped by less than an hour another storm more dangerous than either of the first two, which came on as she was entering Chesapeake bay, and which would have beached her a second time if she had remained but a little while longer outside. For it is not true, as some contend, that narrow escape from a subsequent storm by means of the forecast, skill, and expertness of salvors is not to be considered in cases of this character. See remarks of the courts, *passim*, in *The Earl of Eglinton*, Swabey, 8, and *The Birdie*, 7 Blatchf. at p. 240. See, also, 2 Parsons, Shipp. & Adm. 284, 285.

As to the question of derelict, it has no other connection with this case than as an incident of the danger in which the vessel was when the salvage service was undertaken. A vessel may be a derelict in the eye of the law, and as affecting the amount of the salvage reward, though it may not have been a derelict in fact. It has been held that if a master and crew leave their ship for the safety of their lives, a mere intention of sending a steamer after her does not take away from her the character of a legal derelict. *The Coromandel*, Swabey, 205. If a ship be abandoned by a master and crew, *sine spe recuperandi*, (without hope of recovering her by their own exertions,) which was the case as to the Sandringham and her cargo, it has been held to be a derelict in so far as the amount of the salvor's remuneration

is concerned. *The Genessee*, 12 Jurist, 401; *The Columbia*, 3 Haggard, 428. But the question of derelict is no longer of much importance in cases where the amount of salvage claimed does not exceed half the value of the property saved.

2. The ship and her cargo having been in extreme peril, and been saved, the second consideration is as to the value of things saved. In this case the value of the cargo, $150,000, was readily ascertained by the market prices of cotton. The value of the ship was fixed at $36,000 by the survey that was ordered soon after she was brought off the beach into port. In her then apparently dilapidated condition, and in the reasonable apprehension that she might have been strained by lying for a week on the beach, this valuation may have been much lower than was justified by subsequent developments. She was repaired at the cost of only $14,000, which placed her value when in the hands of her owners, ready to set sail for Liverpool, at only $50,000, which was probably not much more than half her real value. If the salvage is to be estimated by a percentage or proportion, it might be just for me to consider this state of the case in fixing the award; but as the valuation has been treated at the hearing as a thing agreed upon and not in dispute, I will consider the value of the ship to have been only $36,000.

As to the freight, the saving of ship and entire cargo put the ship in condition to make good her contract of affreightment by completing her voyage, and earning the entire freight agreed upon. It has always been claimed, and with some reason, that in such a case as this the whole freight should be estimated in making up the aggregate value, part of which is to be awarded for salvage. I think, however, the weight of authority has settled that the freight to be considered is only such proportion as the distance at which the salvage service was rendered from the port of departure bears to the whole voyage. In the present case, the distance of Norfolk as between Galveston and Liverpool being about half way, the value of freight to be considered must be half the whole, or $7,000. *The Norma*, Lush. 124; Jones, Salvage, 91.

3. As to the risk incurred by the salvors in this case, though their labor was long-continued, it cannot be regarded as having involved extraordinary risk to men experienced in wrecking, and accustomed to the dangers of the sea. Risk to salvors is only of importance as affecting remuneration. It is not a necessary element in salvage, but only a circumstance to be considered as enhancing their reward, if the risk be great. Jones, Salvage, 4; *The Pericles*, B. & L. 80;

*The Bomorsund,* Lush. 77. I do not think the risk to the persons of the salvors of the Sandringham and cargo, experienced seamen as they were, was great enough to materially enhance the award in this case.

4. The value of the property of the libellant which was employed in this enterprise is not shown with accuracy anywhere in the evidence in the case. The steamers, schooners, barges, boats, and some of the material that were employed are mentioned in the depositions; and there is scattered evidence indicating their approximate value. I judge from all that appears on the subject that the property sent to the rescue of this ship by the libellant must have been worth, certainly must have cost, at least $50,000. This property, from the nature of the business in which it was used, was not insurable, and was necessarily put at hazard on a dangerous coast, in the stormy month of November, in a wrecking enterprise conducted among reefs and breakers close to the land. These circumstances must in justice be brought into consideration in estimating the salvage to be awarded in this case.

5. Of the skill shown in this enterprise, occurring where it did and when it did, and occupying a full week, the highest proof is its complete success. Indeed, the fact that these wreckers accomplished their work so very thoroughly and successfully as they did, is used by the respondent as an argument that it could not have been laborious, difficult, or hazardous. But I think the evidence in the cause forbids such an inference. It shows that the task performed by these wreckers was exceptionally arduous, faithful, and meritorious; and, in such a case, the court is forbidden by one of the fundamental maxims of the law of salvage to treat the complete success of the enterprise in any other light than as entitling to an enhancement of reward. To treat the fact of success as depreciating the merit of such an enterprise, would be to cut up by the roots the whole theory and policy of the law of salvage. Success is, indeed, not always the test of merit; but yet nothing could be more subversive of all good policy in human affairs than the opposite doctrine, that it is a proof of demerit. Of course, the idea cannot be tolerated in the present case.

6. The time and labor occupied in this enterprise were extraordinary, and such as are shown by but few admiralty cases. There were half a dozen or more considerable vessels, several surf and other boats, and nearly 100 men engaged every day for a week; and the work was done in rough weather, at a tempestuous season of the year,

when it was necessarily attended by much exposure, both of property
and person. It went on for a week. The wreckers were laboriously
employed, not only in the day-time whenever the weather and sea
would permit, but on one or two occasions in the night-time when the
ship was in especial danger. This extraordinary length of time and
extent of service must, in justice, enter prominently into consideration
in determining the amount due this libellant.

I come now to consider the more general relations of this case to
the law of salvage. It would be an unprofitable task to examine in
detail the many decisions in salvage cases that have been cited by
counsel on each side from the admiralty reporters in their exhaustive
studies of the subject. A peculiarity of admiralty cases, more marked
than in those illustrating any other branch of the law, is that there
are seldom any two cases that are alike in more than one or two of
their features; while they are so dissimilar in all other features as
rarely to afford much ground for safe comparison. But I think they
do show generally that the old rule of allowing to the salvors, arbi-
trarily, in every case, half the values saved, no longer obtains. In-
deed, that rule came at last to so revolt the courts of admiralty that
in their repugnance to it they went far towards the other extreme, and
manifested a temper to confine themselves too much in their awards
to the *quantum meruit* estimate of salvage services. There has lat-
terly, however, been a recurrence from extreme views in that direction
to the middle ground, of adapting the amount allowed to the circum-
stances of each particular case; giving always the *quantum meruit*,
and giving also, when the case admits of generous treatment, as liberal
a *bounty* as may be just and proper. For there are many cases in
which, however meritorious the service may have been in respect to
all the ingredients of salvage service that have been discussed, and
however anxious the courts may have been to grant the *bounty*, yet
the fund in hand for disposal did not afford the allowance of more
than "*adequate remuneration.*"

Admit that a ship and cargo have been in great danger, and that
the services of the salvors have been exceptionally meritorious, and
such as ought to be rewarded by the court with liberal hand; yet how
obvious is the reflection that this may not be done at all with any
justice in some cases, but may be justly done with free hand in oth-
ers. And this brings me to the seventh consideration proper to be
observed in an ordinary salvage.

7. In the case of the *Isaac Allerton*, Marvin, Wrecks & Salvage, 122, (note,) the court in awarding half of $96,000 for salvage, said:

"It is a settled rule of decision in this court, from which it rarely or never departs, that the amount of salvage in a case where the vessel is lost shall be less, though the proportion may be greater, than in a case where the vessel is saved, *cæteris paribus;* and, in proportion somewhat to the promptness and skill with which a vessel is rescued from peril, is the reward to be increased. The reasons for this rule are several, but one is very obvious. When the vessel is lost there is usually a great loss of property; and we are not to aggravate this loss by charging the little that may be saved with a greater salvage than the claims of simple justice to the salvor may demand; and the claims of simple justice to the salvor do not, ordinarily, extend beyond a fair compensation *pro opere et labore.* All beyond this is gratuity, given or withheld by the courts upon grounds of public policy. When the vessel and a large amount of property have been lost, and a fragment only saved, there is little reason, and less means, for giving gratuities. But when the vessel and entire cargo have been rescued from certain peril, a substantial service has been rendered the owners by preventing a loss; they can afford a more liberal reward; and sound policy dictates the propriety, and the amount of property saved furnishes the means, of making a liberal remuneration. Hence the interests of owners and wreckers are made to harmonize."

Of course the learned judge, in the foregoing just observations, does not intend to declare that there are no cases in which salvors are to be allowed a liberal bounty over and above ordinary wages, even though much property was lost and its owner distressingly impoverished; but in the great majority of cases his principle is eminently just, and I thoroughly concur in the rule of action which he propounds. And therefore I do not agree with counsel in this case in their opposing views on the question whether the percentage allowed for salvage shall be less on large values rescued than on small ones, or whether it shall be greater. I think, with the court, in the case of *The Isaac Allerton*, that the proportion of the property lost must enter into consideration. In a case in which, out of property worth $200,000 in danger, only the value of $50,000 was rescued, I would give a smaller percentage for salvage than I would in a case where, other circumstances being equal, property worth $50,-000 was in danger and was all saved. In the first case, other circumstances being the same, and the service such as equally to deserve a liberal allowance, I might feel it unjust to give more than *one-tenth;* while, in the second, I might thing it equally unjust to allow less than one-half.

The many cases cited in the arguments of counsel show, apparently, a great latitude of discrepancy in the amounts of salvage decreed; yet I think if they are studied with some reference to the proposition set forth in *The Allerton Case*, they can be well nigh harmonized. But, whether with or without reference to this consideration, I will now proceed to notice some of the cases cited at bar.

In the case of *The Thetis*, 3 Haggard, 14, much relied upon by counsel for the respondent, one of his Britannic majesty's ships, having on board bullion to the amount of $810,000, belonging to private persons, sank off the Brazilian coast in a cove or inlet between two islands. The salvage was effected by vessels and their crews of his majesty. It was a case, as the judge said, "quite out of the ordinary class of salvage cases;" alluding, I suppose, to the fact that the treasure was private property, was lost by a public vessel, and was recovered by ships and persons in the government service. It had been for a long time held in England that where persons in government employment effected salvage, they were to be allowed "adequate remuneration;" but it had not been held that they should also be allowed the stimulent of the *bounty* which is awarded to voluntary salvors who are not employed in the public service. The case is described in the syllabus as one of "salvage of private treasure and government stores (lost on board a king's ship) by officers and men of the royal navy. Comparative claims of the admiral and subordinate officers. One-fourth of gross value awarded. Upon appeal a further sum awarded of £12,000, ($60,000.) Gross quantity of the treasure recovered, £157,000, ($785,000.) The whole sum deducted for salvage, admiralty claim, and for expenses being £54,000, ($270,-000.)" The work of salvage had consumed 18 months, and had employed a good many men, and several ships, as well as expensive material. Here there was loss by a public ship of nearly half of a private treasure. The salvage was performed by public vessels, and by persons in government service; and, notwithstanding the outright loss of nearly $25,000, there was allowed in the form of salvage (or further loss) more than one-third of what was saved. In the previous case of *The Mary Ann*, 1 Haggard, 158, the question was whether the officers and crew of a revenue sloop of his Britannic majesty, whose duty it was to give aid to distressed British vessels, should be awarded salvage in a case in which they had come to the aid of a ship in great distress, bound from Jamaica, and found in utter helplessness off the

western coast of Ireland. She had been under continued stress of weather, was full of water, was out of provisions, and was drifting fast towards the rocks. She was boarded, and the ship and cargo, though greatly damaged, saved. The demand of the libel was "for *remuneration* of salvage services," not for the extraordinary bounty given to voluntary salvors. The court said:

"Undoubtedly the parties may fairly claim a remuneration. Although the ship belongs to the state, and although there is an obligation upon king's ships to assist the merchant vessels of this country; yet, when services have been rendered, those who confer them are entitled to an *adequate reward*."

In this case there had been great loss; there was far from a complete saving of property; it was saved by men whose duty it was to attempt the task; and yet, although the salvors demanded and could only recover a fair *remuneration* for their services, the court awarded *one-tenth*.

In the case of *The Amerique*, 1 Am. Law & Eq. 17; S. C. L. R. 6 Priv. Co. App. 468, only 10 per cent. was given, although there was no loss of ship and cargo, the steam-ship Amerique having been found floating in the ocean abandoned by officers, crew, and passengers, and having been simply towed into port. It was a case of technical derelict, but the other ingredients of a salvage service were wanting. The court gave but one-tenth, on the express ground that the services rendered were inconsiderable, and the demand out of all proportion to them. When enterprising mariners find a ship worth hundreds of thousands of dollars floating quietly on the ocean, it does not require the stimulant of a 25 or 50 per cent. bounty to inspire them to tow her into port. The court looked at the reason of the law, and not at the letter, in this case, and refused to "stick in the bark."

In the American case of the *Steam-ship Swiftsure*, 4 FED. REP. 463, the ship, mistaking the channel, went ashore on the sand beach north of Cape Charles at 9 A. M. of a clear day in May, 1880, on a smooth sea, and lay there until 2 o'clock waiting to be floated off by a tide; her chief officers drunk. At that hour two very strong steam-tugs, which, in pursuing their regular business, had been looking for vessels coming in to be towed, came along-side, and on being asked to go to work, made fast two hawsers to the stern of the ship, and the two tugs, pulling together, and aided by the powerful propeller of the ship, soon got her afloat and out to sea, when they let

her go, and she came herself into the port of Baltimore. The value of ship and cargo together was $125,000. There was no damage; everything was saved. Here the owners could well have afforded the allowance of a liberal *bounty*, in addition to a fair remuneration for actual service, if the case had contained the ingredients which make up every true salvage service; but it did not contain those ingredients. The danger of the ship at 2 o'clock, whatever it might have become 12 hours later, after night had supervened, was in fact very inconsiderable; and the service of the two tugs was very little more than that of towage. The salvors were in absolutely no risk. The skill shown was no more than what the rudest tugmen who had never seen a wreck might have exhibited. The time was but three hours; for the tugs were already out there in the course of their regular calling, looking for tows. The judge thought that the ship was only in prospective peril, because, at the time the tugs went to work with her, the wind and sea were increasing, and that part of the coast was dangerous, and liable to sudden storms. This peril was the only salvage ingredient in the case, and it was prospective. But for it the service would have been strictly one of towage. And so the judge says, as if apologetically for admitting the element of *bounty* in his award at all:

"The allowance in such cases is intended to be sufficiently liberal to make every one concerned eager to perform the service with promptness and energy, and also to encourage the maintenance of steam-vessels sufficiently powerful to make the assistance effective. It would be contrary to the spirit of the maritime law to reduce the salvage compensation below the standard of liberal inducement, and it would equally frustrate its purpose if the allowance should be so large and so out of proportion to the services actually rendered as to cause vessels (in critical situations) to hesitate or decline to receive assistance because of its ruinous cost."

And so, rejecting the demand for $40,000 as exorbitant, the judge awarded the sum of $2,500.

In the case of *The Blackwall*, 10 Wall. 1, where a ship on fire at anchor in the harbor of San Francisco was saved by city firemen, aided by a tug, there was much damage by the fire, and the water thrown by the firemen; but the ship and cargo, after the extinction of the fire, were valued at $100,000. The firemen were at work 30 minutes. Though the ship was in great danger, neither the firemen nor their engine, nor the assisting tug, were in any serious danger, if any danger at all, during the service. The case was wanting in some of

the important ingredients of salvage services, yet the court allowed *one-tenth*.

In the case of *The Camanche*, 8 Wall. 448, valuable property designed for the construction of a naval monitor was sunk in or near a dock in the harbor of San Francisco. The libel was for salvage on that proportion of the property which was not insured, worth $75,000; the service for the proportion which was insured having been compensated by contract. The service consisted in saving heavy material from the bottom of the harbor by means of diving bells and lifting machinery. It could only be done by skilled men, and by the use of expensive machinery. The labor was arduous. The work was attended with danger and great difficulty. It lasted from January 28 until May 20, 1864, nearly four months. The amount allowed was one-third of the value saved; the salvors receiving proportionate compensation in addition from the insurance companies.

I need not pursue the examination of reported cases further. I have referred to these that have been named only for the purpose of illustrating the principles of my present decision.

The case of the Sandringham was one into which every ingredient of a true salvage service entered materially. The ship, herself was in great peril; indeed, her condition was well nigh hopeless. In the event of her sinking in the sand, filled with compressed cotton tightly compacted, the cargo could only have been saved partially, with difficulty, and in a damaged condition. The task of the wreckers was full of toil and risk, performed as it was on a dangerous coast, liable to sudden storms and sea-swells. The work was bravely undertaken, perseveringly and faithfully pursued, and successfully accomplished. There were several steamers engaged, which are always accorded a higher compensation than other vessels. 8 Wall. 471; *The Kingalock*, 1 Spinks, 267. There were schooners, barges, surf-boats, and much valuable wrecking material also at hazard, without insurance. There was no loss to the owners; every bale of cotton was saved, and not a bale was damaged.

I think the services and the precedents concur in justifying an award of one-fourth of the aggregate values saved, estimating that aggregate value to be $193,000. I will decree one-fourth of that amount and costs.

I have been thus elaborate in setting forth the grounds of my award in this case because of the language used by the supreme court of the United States, (8 Wall., on page 479:)

"Appellate courts are reluctant to disturb an award for salvage, on the ground that the subordinate court gave too large a sum to salvors, unless they are clearly satisfied that the court below made an exorbitant estimate of their services."

I have desired that in the event of an appeal from this decision the facts and principles on which it is based may be fully understood by the courts above.

Thirty days will be allowed for an appeal. There was no appeal.

NOTE. The amount of salvage to be awarded must be estimated by the compound consideration of the danger and importance of the service, and the value of the property saved is an essential circumstance in estimating the latter.(a) The long-settled practice has been to view the compensation for such services as a reward for bravely encountering the perils of the seas in the interest of commerce and navigation;(b) and it should always comprehend a reward for the risk of life or property, labor and danger, and should be so liberal as to afford inducement to exertions to save life and property.(c) Effective service by steam-vessels should be particularly encourged.(d) If the service is merely that of ordinary towage, as a general rule only the usual towage compensation is to be given,(e) in addition to the expense and time of going out to render the service;(f) but the reward, even in derelict cases, should be governed by the general principles, namely: danger to property, value, risk, risk of life, skill, labor, and duration of service,(g) and the large value at risk.(h)

As to the amount of compensation for salvage service, there is no fixed rule nor precedent nor practice in admiralty,(i) and there is no rule but that which a sound discretion may suggest upon a view of all the circumstances of each particular case.(j) The court may reward not only according to the merit of the service, but also in proportion to the value of the property rescued;(k) and the leading and dominant consideration ought to be the benefit arising to the owner.(l)

Salvage is generally decreed on all property salved, whether ship,(m) cargo,(n) or the freight.(o)—ED.

(a) The Elvira, Gilp. 60.

(b) The Blaireau, 2 Cranch, 240; The Sarah, 1 C. Rob. 313, note; The William Beckford, 3 C. Rob. 286; The Hector, 3 Hagg. Adm. 90; The Clifton, Id. 117; The Industry, Id. 203.

(c) Bond v. The Cora, 2 Wash. C. C. 80; The Steam-ship Swiftsure, 4 Fed. Rep. 463.

(d) The William Penn, 1 Am. Law Reg. 584; The Raikes, 1 Hagg. Adm. 246; The Alfen, Swab. 190; Atlas Steam-ship Co. v. Steam-ship Colon, 4 Fed. Rep. 469.

(e) The Princess Alice, 3 W. Rob. 138; The Harbinger, 20 Eng. L. & E. 641; The Albion, 2 Hagg. Adm. 180, note; 3 Hagg. Adm. 254.

(f) The Graces, 2 W. Rob. 294.

(g) The Ship Suliote, 5 Fed. Rep. 99; The Bark Lovetand, Id. 105; The John E. Clayton, 4 Blatchf. 372; Post v. Jones, 19 How. 150; The Leander, Bee, 260; The Ebenezer, 8 Jurist, 385; The Henry Ewbank, 1 Spr. 400.

(h) The Ship Suliote, 5 Fed. Rep. 99; The Henry Ewbank, 1 Sumn. 400; The Earl of Eglinton, Swab. 7.

(i) The B. C. Terry, 9 Fed. Rep. 920; The Thetis. 3 Hagg. Adm. 14; The Steamer Leipsic, 5 Fed. Rep. 109.

(j) Bond v. The Cora, 2 Wash. C. C. 80; Tyson v. Prior, 1 Gall. 133; The Mary E. Long, 7 Fed. Rep. 364; The Levi Davis, 9 Fed. Rep. 715; The B. C. Terry, 9 Fed. Rep. 920.

(k) The Waterloo, Blatchf. & H. 114; The Plymouth Rock, 9 Fed. Rep. 413.

(l) Taylor v. The Cato, 1 Pet. Adm. 48.

(m) The Selina, 2 Notes of Cas 18.

(n) The George Dean, Swab. 290; The Mary Pleasants, Id. 224.

(o) The Peace, Id. 115; The Norma, Lush. 124; The Dorothy Foster, 6 C. Rob. 88; The Progress, 1 Edw. Adm. 210; The Racehorse, 3 C. Rob. 101.