### THE ALAMO.

### LEWIS v. ATCHISON.

(Circuit Court of Appeals, Fifth Circuit. June 9, 1896.)

No. 492.

1. SALVAGE SERVICES—STRANDING ON CORAL REEF—DEGREE OF DANGER.
A steamer stranded upon one of the Florida coral reefs is always to be considered as in a position of danger, as she is liable to go to pieces on the rocks upon the rising of the wind.

2. SAME—AMOUNT OF COMPENSATION.
Where a large steamer went fast aground on Maryland shoals (being part of the Florida coral reefs, 15 miles from the port of Key West), in such a position that she could only be taken off into the interior of the reef, and was got off and piloted out of the reef, uninjured, after some 24 hours' labor, through the aid of a tug and several sailing vessels under the charge of licensed wreckers, *held*, that an award of $15,000, upon a valuation of $500,000, was not excessive, and would not be reduced on appeal; it appearing that six loads of cargo, admeasuring some 300 tons, were taken out during a wind of from 15 to 18 miles an hour, with considerable danger both to the salving vessels, and to the lives of their crews.

Appeal from the District Court of the United States for the Southern District of Florida.

This was a libel in rem by Alfred Atchison against the steamship Alamo and cargo (James F. Lewis, claimant) to recover compensation for salvage services. The district court awarded the sum of $15,000 to the salvors, and the claimant has appealed.

W. Mynderse, for appellant.

John D. Rouse and Wm. Grant, for appellee.

Before PARDEE and McCORMICK, Circuit Judges, and SPEER, District Judge.

SPEER, District Judge. The facts in this case are quite fairly and sufficiently set out in the opinion of Judge Locke, of the Southern district of Florida, which is as follows:

"This steamship, bound from New York to Galveston, via Key West, with a large and valuable cargo, went ashore on Maryland shoals, a part of the Florida reef, about 15 miles from the port of Key West, at about 2 o'clock p. m., the 22d of January, 1896. She was going about twelve knots an hour, and, although the tide had been falling about two hours, she was driven hard ashore, as the subsequent history of the case shows. She went nearly upon the highest crest or ridge of an outside reef, but in such a manner that she could only back off into water inside of the reef, and not into the open and clear navigation. The libelants, all licensed wreckers of this district, with one steam tug and several sailing vessels, went to her assistance, reaching there early in the evening, and their services were accepted upon the understanding that the compensation was to be determined by the underwriters when they got the vessel off. Finding a shoal with but little depth of water, off the starboard side aft, to prevent the ship swinging against it the libelants carried out three anchors,—one of 900 pounds, and one of 500 backed by one of 400 from the port quarter,—which they made fast. They continued tugging with the tug for two or three hours every high water, and lightened the steamship by taking out seven loads of cargo, about three hundred tons measurement, until the third high tide, Friday morning, the 24th, she was gotten off into deep water, where she was anchored. She then being inside the reef and shoals, her head was towed around into the proper direction, and she piloted by following the tug out into open water. She was entirely uninjured, and able to carry on her cargo with no loss, nor any more damage than was caused by the dropping of one case into the water from the slings while discharging. The only questions of fact upon which there is any material difference of testimony are concerning the depth of water, the character of the bottom, and the force of the wind and sea at the time. Upon these questions the testimony of the libelants differs somewhat from the testimony of the master of the steamship, the only witness for the claimants. The testimony of the libelants shows that, although the weather was fairly pleasant at the time the service commenced, yet the wind increased materially until Thursday, when there was a high wind and high sea. The master says the weather was fine, but that there was a fresh breeze, 15 or 16 miles an hour; there was more or less swell at the time. Capt. Hand, of the revenue cutter, went there to tender his assistance, but found that it was not the right time of the tide when he arrived; and he did not see fit to remain until the next high tide, although it could have been but a short time, as he was there at 11:30, and it was high tide at not far from 1. He says his log showed a relative force of wind of 6 upon a scale running from 0 to 10, from a calm to a hurricane; that there was quite a heavy sea setting in from the S. S. E., through the channel, and across the shoal, and around the steamer. The schooner alongside the steamship was pitching and laboring considerably. He thought it dangerous for vessels to go alongside the Alamo; that the sea was breaking fore and aft of her, and the vessel alongside could get no lee. The revenue cutter had taken Mr. Sothwick, the agent of the line resident at Key West, to the steamer; but it was too rough for him to go aboard, and he returned without doing so. The observer of the weather bureau says the highest velocity of the wind at Key West at any time the vessel was ashore was 18 miles an hour. To one unaccustomed to measure or estimate the force of the wind and sea from the velocity as shown by the instruments in use by the weather bureau, the number of miles given represents a vague and undetermined force. Since the hearing of this case, I have had an opportunity to observe, and have taken particular notice of, the force of the wind, and the amount of sea caused, even in the harbor of Key West, with a south wind at 18 miles an hour, as shown by the weather bureau; and I am satisfied that upon a crest of an outside reef, where the bottom comes up suddenly from 14½ fathoms into 10, 12, and 15 feet, exposed to the full sweep of the sea, there must have been sufficient wind and sea, with the wind but 18 miles an hour, to justify the use of every term used by the salvors or Capt. Hand in describing it. To one on board the steamship lying hard and fast upon the bottom, unquestionably, it seemed and appeared as fine weather, and nothing but a stiff breeze; but I consider that it was sufficient to explain the amount of damage done

the salvors' vessels, and show that to them it was, to a certain extent, perilous and dangerous to go alongside the ship and take cargo. For the two days following the freeing of the vessel from the bottom, the wind increased. The next day it was 23 miles, and the next 43 miles, an hour. The bottom upon which the vessel was lying has been testified to by the libelants, who, as wreckers, are familiar with every portion of the reef, as rough, rocky bottom. The master of the steamer found sand on his lead, and says that the propeller dug a hole in the sand, and threw it up alongside the vessel, and the chart makes the bottom inside of the crest of the reef sand. The formation of all reefs and shoals along the Florida reef is undoubtedly coral rock, rough and broken for the most part, but with the hollows and the spaces back of the outlying reefs filled and covered with sand to a greater or less degree. There was probably sand upon the reef in this place, but it cannot be accepted that this was a sand bar upon which a vessel could lie with safety. The testimony regarding a shoal off the starboard quarter is given by a witness of whom I have personal knowledge, and in whom I have the most implicit confidence, and there is no doubt in my mind but that there was one there.

"The testimony in behalf of the libelants shows that they found but 12 and 13 feet of water forward under the ship about 11 o'clock, the night of going ashore, about two hours before high water, while the testimony of the master shows from 14 forward to 16 aft, with about half tide,—as much as she was drawing before going ashore, according to his statements. Subsequent events show that after she had been lightened of 110 tons of water ballast, in addition to the cargo taken out, it was impossible to get her afloat until the third high tide. This satisfies me that she must have been driven up into considerable less water in going ashore than she was drawing when afloat. In regard to the weight of the cargo taken out by the salvors, the master says that it was estimated by experts in Galveston at 60 tons. There is nothing that gives validity to such estimate, or removes from it the character of hearsay evidence, or makes it admissible, and it certainly leaves the question open for consideration. The testimony shows that 2,548 packages were returned from the salving vessels on board the ship. The character of the cargo is testified to as being 'sugar, potatoes, oil, iron, whisky, liquors, coffee, rice, and just the heaviest stuff we could find.' In the light of this testimony, I cannot accept the conclusion that the packages weighed less than an average of 50 pounds apiece, and that there was but 60 tons taken out, although some experts may have so estimated. But it is not necessary to review more fully the minutiæ of the services rendered. The property was in peril, the risks assumed unusual, the services needed, and everything done that was necessary, and was perfectly successful. It is impossible to determine just how much force the tug Childs exerted, or what proportion of the force required to float the ship was furnished by her, or just how many inches the vessel was lightened by the cargo removed. The experience of twenty-five years in constant contact with, and study of losses on, the Florida reef, satisfies me that at no time can a large steamer, heavily laden, resting upon one of its exposed points or reefs, be considered out of danger. In too many cases have apparent safety, and the prospect of an early and easy relief, misled masters to their sorrow. The master of this steamship might possibly have jettisoned a hundred or so tons of coal, and floated her off, but the questions of the time it would have taken; the fact that the coal could not have been taken from the forward part of the vessel, as the cargo was; whether by that time she might not have been resting upon the shoal under the starboard quarter; the fact that when afloat she would still have been within the reef, with the same uncertain current that set her there,—all together make the final extrication unaided so problematical that no careful owner, if present, would have assumed the risk for a small percentage of the value involved. The Leona, the ship of the same line that was expected within the next three days, might have arrived; but, in order to have been of any service, she would have been compelled to come inside the reefs herself, and encounter unusual dangers. There can be no question but that the ship and cargo were exposed to unusual risks and peril, and that the salvor vessels encountered dangers and took risks far greater than ordinary navigation.

"It is true that the ship was but 15 miles from the port of Key West, and this fact has been commented upon as a matter of great importance to induce a low salvage; but, as far as being in a condition of safety or danger, she might as well have been on French, Conch, or Pickles reef. Fifteen miles from any of our large seaports, Boston, New York, Philadelphia, Baltimore, or Norfolk, is really within the protection of a partial harbor, and the opportunity to procure aid from such a port is unlimited; but here the point upon which the ship rested was as fully exposed as if it had been a hundred miles distant, and the means of assistance at the port of Key West were exhausted when the salvors who came to her aid offered themselves. Had it been necessary to land much of the cargo, as it has been occasionally, then the proximity of the port would have been of advantage to the salvors; but, as it was, the peril was just as great, and the service just as valuable, as if it had been at a greater distance. The want of fixed and determined rules for awarding salvage compensation has been frequently remarked and commented upon by all judges called upon to decide such cases. All courts cite, and endeavor to follow, the same well-established principles, yet there is no class of cases where the results are examined with less satisfaction. And yet, although each case is disposed of upon its own particular merits, whenever the discretion of the court can be guided by considerations and estimates which have entered into a line of decisions, with facts nearly similar, I consider it the duty of the judge to recognize such decisions and precedents, as in any other class of cases. In the case of The Neto and Cargo, 15 Fed. 819, I have reviewed briefly several of the cases where steamships had been relieved from the bottom by the wreckers of this district, and salvage decreed. In that case it was remarked that salvage services rendered in different localities are apt to be diverse in their nature; and, when causes can be selected from the same district, it may not be amiss to accept suggestions, and follow as near as may be the precedents established. The general principle that salvage is a bonus or gratuity to encourage services of like nature in behalf of commerce is accepted by all admiralty courts; but within this district there has always been an additional principle recognized by congressional legislation and judicial decisions, namely, that it is for the benefit of commerce to keep and encourage a class of vessels and salvors within this district, licensed and recognized as such, which are amenable to the rules of wrecking established by the court. For nearly sixty years this condition of things has existed, and the interests of commerce have been recognized and protected, and millions of dollars' worth of property saved, much of which, without the presence of this or a similar class of salvors, would have been lost. The extent of the wrecking grounds along the reef from Tortugas to Cape Florida, a distance of about two hundred miles, any portion of which may be at any time a scene of disaster; the lack of means for conveying speedy information, there being no telegraph communication; and the importance of immediate assistance when a vessel is once upon the exposed portion of the reef,—have rendered the modern means of wrecking (a large and expensive accumulation of outfit and appliances at a commercial center) unfitted for this locality; and although wrecking tugs, with extensive outfits, were for some years stationed within the district, it was ascertained that the character of the aid required was a lighter and less expensive class of vessels, scattered more generally the entire length of the reef, and the saving of the property has been for twenty years left to the regular licensed resident wreckers. The protection to navigation by the increase of lights, buoys, and beacons along the reef, as well as the much larger proportion of commerce being carried on by regular lines of steamships, have diminished the number of wrecks, and compelled many of the licensed wrecking vessels to resort to additional means, which do not take them away from the reef and wrecking grounds, to aid them in gaining a precarious living. Many have therefore joined to wrecking, turtling, sponging, or fishing, or freighting between Key West and the upper keys, or Miami, along the reef, as appears in the testimony in this case. But the reef remains, with its dangerous shoals and its irregular and uncertain currents, and it is necessary that there should be some one ready to aid vessels in distress: and the licensed wreckers, although, from necessity, resorting to other means for a partial support, still largely depend upon wrecking, and hold themselves in

readiness to assist vessels in distress, and to comply with the rules governing wrecking.

"The cases of salvage adjudicated in this district are not, therefore, generally separate, individual cases, where the accidental, volunteer salvor gets a bonus and gratuity, in addition to his ordinary means of livelihood, for but a few hours' interference with his regular occupation. They are cases of the same vessels and the same men appearing, year after year, looking, not for the bonus for a few hours' labor in a particular case, but for a compensation, as far as a reasonable allowance can repay them, for weeks, and perhaps months, that they held themselves in readiness at any time to go to the aid of property in distress. They have also, in justice, a right to ask from commerce some compensation for labor in cases in which, under the rules by which they hold their licenses, they have exerted themselves unsuccessfully to save property, or perhaps where, if successful, the small value of the property has not permitted a payment for even their labor. In this case are found several of the same vessels, and many of the men, who in the cases of the Oxford, the Earl King, the Slobadna, and other wrecks, rendered valuable service in saving property, but on account of its insufficient value, or the circumstances of great labor and hardship, did not receive ordinary wages for laboring night and day, in and under water, under circumstances of the greatest discomfort and exposure, although there was the utmost liberality in decreeing salvage that the values would allow. It has therefore never been considered, in this district, that, in order to entitle a regular licensed wrecker to such a bonus or gratuity as is contemplated by salvage awards, he must prove an heroic risking of life and property, or that, had it not been for him, the saved property would have unquestionably been lost. Property in a perilous position, and readiness to assist, and an honest effort to do all that the circumstances required and his powers enabled him to accomplish, have been considered sufficient, and the measure of success, the actual service rendered, and the amount assisted have determined his compensation. The course, I consider, has only been fairly compensatory, if even so, to the wreckers, and not unreasonably burdensome to commerce, or the property saved. Frequently it has been the case that in long-continued service, or where it has happened that the final demand for men and vessels might be unusually large, more assistance has been accepted than was actually required, but in no such case has the ordinary or usual rate of salvage been increased on that account. The salvors in one case have shared their earnings with those who in preceding or subsequent cases had shared, or would share, their earnings with them. The reasons induce me to give an amount in this case that might, perhaps, in some other districts, be considered unusually large; but I do not consider the time has arrived when the particular character and claims of the licensed wreckers, within reasonable bounds, should be ignored. When salvages are awarded upon large values, a fixed amount is usually given, but a salvage compensation may as well be computed by a percentage, as commissions, insurance, or other business charges. The average rate per cent. of salvage paid in the numerous cases cited in the case of The Neto and Cargo, 15 Fed. 819, which comprise the most important of those in which assistance was rendered to steamships for many years, was about 13½ per cent.; but this case is one where the value is large, with comparatively little labor, and a small percentage will give a fairly liberal compensation, and not be unreasonably large nor burdensome to the property. The agreed value of the property salved being $515,000 the district court will fix the sum of $15,000 as compensation for the salvage services rendered."

From this judgment, and the decree entered thereon, an appeal was taken. It is, in the outset, stated that the services of the libelant were salvage services. The supreme court, in the case of Cope v. Dry-Dock Co., 119 U. S. 625, 7 Sup. Ct. 336, and Sir John Nicholl, in The Clifton, 3 Hagg. Adm. 118, and other authorities and several distinguished writers, have afforded definitions of salvage services, and the amount of importance to be attached to the

various elements in which they may be subdivided. Sir William R. Kennedy, one of the judges of the queen's bench division, in his recent work on the Law of Civil Salvage, remarks:

"Some circumstances are always material for consideration, and these have been ascertained by experience, and the court has for its guidance a long course of judicial decisions to assist it in coming to a proper conclusion in each particular case. These material circumstances, which Dr. Lushington, in his judgment in The Charlotte, 3 W. Rob. Adm. 68, 71, calls 'the many and divers ingredients of the salvage service,' it is necessary now to consider in detail. These may be classified as follows: (a) As regards the thing salved: (1) The degree of danger to human life. (2) The degree of danger to property. (3) The value of the property salved. (b) As regards the salvors: (4) The degree of danger to human life. (5) Their skill and conduct. (6) The value of the property employed in the salvage service. (7) The danger to which the property is exposed. (8) The time and labor expended in the performance of the salvage service. (9) Responsibilities incurred in the performance of the salvage service, such, e. g., as risk to the insurance, and liability to passengers or freighters through deviation or delay. (10) A loss or expense incurred in the performance of the salvage service, such, e. g., as detention, loss of profitable trade, or repair of damage caused to ships, boats, or gear."

Upon this subdivision, Mr. Justice Kennedy makes an observation similar to that made in the supreme court in the case of Cope v. Dry-Dock Co., supra, as follows:

"Where all or many of these elements are found to exist, or some of them are found to exist in a high degree, a large reward is given. Where few of them are found, or where they are present only in a low degree, the salvage remuneration awarded is comparatively small." Kenn. Civ. Salv. 119."

When we apply this acknowledged law of salvage to the facts of the case before us, there will appear little, if any, reason to disturb the judgment of the district court. The danger to human life was not inconsiderable. The Alamo was aground on one of the Florida coral reefs, which for several centuries have been regarded as dangerous to navigation in those waters. She had penetrated an interval in the coral formation, and was resting on its shoreward slope, which was exposed to the unimpeded force of the Atlantic. The wind was strong, and had she remained aground she would have experienced a gale blowing 43 miles an hour. No mariner will doubt that, but for her prompt delivery from her dangerous situation, she might have broken to pieces in a very few hours, with a total loss of ship and cargo. It was stated in the argument that on any other part of the coast her condition would have been treated as one of trivial importance in navigation. This is scarcely justifiable. An iron steamship, heavily laden, ashore anywhere on the Atlantic coast, is in very great peril, and she is probably in greater peril on the coral formation of Florida than elsewhere. In the sands extending from the neighborhood of the Tybee inlet to the capes of Virginia, the danger is that she will become rapidly buried in the sand, and finally sink out of sight, without hope of rescue. On the Florida reefs the danger is that the stranded vessel will rapidly break to pieces, and the master who fails to recognize the imminent danger of the vessel when aground from 24 to 48 hours is guilty of temerity not belonging to a prudent and reasonable navi-

gator. But it is said the Alamo was not on the coral formation, but was on the sand, because the turning of her propeller worked a hole in the sand some 20 feet deep. A sufficient reply to this is that the evidence was undisputed, and the district judge, on hearing the witnesses, found the fact to be as stated in the libel. It is, moreover, true that there are deposits of sand in immediate proximity to the coral rock, and we can therefore reconcile our minds to the conflict between the testimony for the steamer and the libelant without imputing perjury to either. If the ship had gone to pieces, as was not unlikely, the crew would have been in great danger. As regards the salvors, the danger to human life was constantly present. With wind estimated anywhere from 40 to 48 miles an hour, they were compelled, on the ocean, to approach a vessel aground, in their small, fragile craft. Every seaman knows how difficult is this duty, and how easy it is for the waves to shiver such boats against the vessel, which contingency is as dangerous as a rock in midocean, and that such skill in conducting this was remarkable. These men are probably quite as expert in the management of their small sailing crafts as any other toilers of the sea, and the value of the numerous schooners and the tugboats is, in the aggregate, quite considerable. Several of these vessels were injured, and might have been destroyed but for the skill with which they were managed. The time and labor of the salvage service were not great, but this was due to the remarkable skill and daring of the salvors. The charges to the Alamo by the salvage service was due to the great values in the steamer and her cargo which were so successfully relieved from imminent peril. This amounted to about $515,000. This was agreed upon, and the agreement is in the record. It may be possible that, if the case had been originally submitted to us, we would not have allowed salvage in amount quite so large as that given by the district judge, although it is by no means so extravagant as to shock the conscience of the court; and, under the circumstances, we see no good reason why it should be reduced. It appears from the record that the claimant of the Alamo was required to deposit in the subtreasury of New York $65,000 in cash, in order to secure the demands of the libelants, and to procure the release of the steamship. This was, under the circumstances, an exorbitant requirement, and, if the evidence in the record had afforded the data by which we could have ascertained the cost to the claimant of securing so large a deposit in cash, we would have attempted to reduce the amount of salvage in such a sum as would be fairly proportionate between this deposit and what would have been proper and reasonable security under the circumstances. The decree of the district court is affirmed.