## THE ALEXANDRA.

(District Court, D. South Carolina. November 14, 1900.)

1. DEPOSITIONS DE BENE ESSE—RIGHT TO TAKE IN FOREIGN COUNTRY.
    Depositions de bene esse cannot be taken, under Rev. St. § 863, in a foreign country.

2. ADMIRALTY PLEADING—ISSUES—PETITION OF INTERVENTION.
    Where the respondent in a suit in admiralty desires to raise a new issue, in addition to those raised by the answer as filed, it should be done either by amendment to the answer or by a proper plea. When the answer was filed by the master of the libeled vessel as agent for the owners, such owners cannot raise a new issue by a petition in intervention, filed without notice to the libelant, or the service of a copy on him.

3. SALVAGE—ACTIONS—PLEADING.
    Where the respondent in a suit to recover for salvage services relies upon a defense of misconduct on the part of libelants which forfeited their right to recover salvage, he must specially allege the facts constituting such misconduct, with due certainty of time, place, and circumstances, and the proof must support such allegations.

4. SAME—AMOUNT OF AWARD.
    A steamship grounded upon a reef off the Florida Keys. Her value with cargo and freight was from $200,000 to $225,000. She was rescued by libelants, who were licensed wreckers, without injury, and with the loss of but a small part in value of her cargo, which was jettisoned. She was off a lonely part of the coast, 90 miles from Key West, and there was considerable danger from storms at that season, although the weather was fair during the two days occupied in the salvage operations. Libelants employed in the service some 18 or 19 wrecking sloops and schooners, valued at about $27,000, and 120 to 130 men, who unloaded upon the wrecking vessels. as lighters, 130 tons of cargo, which was afterwards reloaded, and jettisoned about 130 tons of lumber. They were also aided on the second day, for a few hours, by a tug valued at $35,000. The service was attended by no great risk of life or property. The vessel was once floated and again grounded, and there was some evidence that the master wrecker was in part in fault for the second grounding, which rendered the services of the tug necessary. *Held*, that an award of $11,500 was proper, to cover all the services.

In Admiralty. Suit to recover for salvage services.

Bryan & Bryan, for libelants.
Mitchell & Smith and C. B. Northrop, for respondents.

BRAWLEY, District Judge. The amended libel, filed December 5, 1899, in behalf of the owners and crew of sundry licensed wrecking schooners and sloops therein named, and of sundry wrecking sloop boats, and of the owners and crew of the steamtug Dauntless, claims salvage for services rendered to the Danish steamship Alexandra. The answer of A. G. Blom, master and claimant of the steamship Alexandra, filed January 2, 1900, admits the services, alleges unskillfulness and negligence in the performance of the same, and prays that the court should make a moderate award of salvage, and that the costs of the respondent be decreed against the libelants, for the reason that no settlement could be reached with libelants, because of their exorbitant and excessive demands, although efforts were made to come to an agreement with them. On February 1, 1900, Det Forenede Dampskibs Selskab, of Copenhagen, filed its petition and bond, and, in pursuance of an order of court granting leave to inter-

vene, filed its intervention, alleging that it was a corporation duly chartered under the laws of the kingdom of Denmark, and that it was the owner of the steamship Alexandra, and alleged that the master, A. G. Blom, had admitted that he had accepted an offer of gratuity from the wreckers and salvors who claimed salvage in this cause, and that said wreckers and salvors, by such offers of gratuity, had forfeited all salvage, and prayed that a decree be entered denying the same. The Danish steamship Alexandra, laden with cotton, cotton-seed meal, and lumber, bound from New Orleans to Copenhagen, while passing up the Straits of Florida went ashore on Conch reef, near Alligator light, about 9 o'clock on the night of September 12, 1899, through gross negligence in navigation. The testimony shows that Alligator light threw a red flash light, the signal of danger, across her course for a considerable period before she grounded. Shortly after the grounding of the vessel, she was spoken by Roberts, one of the libelants, who offered his assistance; and on the next day a number of sloops and schooners, regularly licensed by the United States district court for the Southern district of Florida, engaged in the business of wrecking on the coast of Florida, and who are required by the rule of that court to have their vessels properly equipped for such service, appeared in response to messages sent by Roberts, and, under his direction, with the aid of the ship's cranes and winches, about 130 tons of cargo, consisting of cotton and cotton-seed meal, was transferred to 15 of the schooners and sloops, and about 130 tons of lumber, etc., was jettisoned. Shortly after the grounding the crew of the Alexandra ran out a kedge anchor from her starboard quarter and her port bow anchor, and on the next morning, with the aid of the wrecking schooners, they ran out a large kedge anchor about 90 fathoms from the vessel's stern, and about 12 o'clock on the night of the 13th, at high water, the steamship, using her engines and winches, and hauling upon the anchors, came afloat, but in turning around she got aground for the second time. The tide having fallen, no further effort was made to get her off until the next morning, the 14th, when the steamtug Dauntless, on her way from Havana to Brunswick or Jacksonville, passing by the Florida reefs, was engaged by Roberts, the master wrecker, to assist in salving the steamship. With the assistance of the Dauntless, she was floated at 2:10 on that day, and hauled into the Gulf Stream and anchored. The cargo which had been lightered on the wrecking sloops and schooners was put aboard on the 15th, and the steamship proceeded on her voyage, intending to go to Newport News for coal; but about 24 hours after starting the crank shaft of the steamship was broken, and the vessel put into the port of Charleston, where she was libeled. Roberts, the master wrecker, and Albury, one of his associates, came aboard of her.

Before disposing of the case, certain questions of pleading and practice which have arisen in its progress demand attention. It will be observed that the issue made by the libel and answer is simply the amount of salvage. The intervention of Det Forenede Dampskibs Selskab, of Copenhagen, owner of the steamship, makes a new and entirely different issue. It claims that the salvage was forfeited

by misconduct of the salvors and their agents and representatives, in offering a gratuity to the master. The eighth rule of the wrecking rules of the Southern district of Florida provides:

"Any wreckers who give or agree to give the master any part of the salvage or other sum of money or make him any unlawful present or help him in any manner to make any money out of the wreck of his vessel, shall forfeit their salvage."

This intervention makes a new issue, which goes to the very root of the case. If supported by sufficient proof, the libel would be dismissed. It is an altogether different defense to that made in the answer, which went merely to the quantum of the award. No notice was given of the filing of such intervention, and no copy was served upon the proctors for libelants, who say that until the opening of a certain deposition, to be hereafter adverted to, they had no notice that such defense was interposed. Proctors for the intervener claim that notice was not necessary; that the libelants, being parties to the cause, were bound to take notice of the intervening petition and of the proceedings thereunder. There has been no motion to vacate the order allowing the intervention, which I think would have been the proper practice; but the question arises upon a motion to strike out certain questions and answers in the deposition of Blom, as being irrelevant to the issues made in the pleading. On the day of the filing of the intervention, notice was given that the "intervener herein" would take the testimony of A. H. Blom, at Copenhagen, in Denmark, before J. C. Ingersol, Esq., consul for the United States, in accordance with the provisions of sections 863 and 1750 of the Revised Statutes. The deposition of Blom was taken by said consul in the form of questions and answers, and returned by him to the clerk of this court; being received by mail March 28, 1900. On April 12, 1900, while the court was proceeding to hear the testimony in behalf of the libelants, a large number of witnesses from the south coast of Florida being in attendance, a motion was made to suppress the deposition on the ground that depositions de bene esse could not be taken in a foreign country. Proctors for intervener cited and relied on the opinion of Judge Blatchford in Bischhoffsheim v. Baltzer (C. C.) 10 Fed. 4, in which it was held that "depositions de bene esse in civil causes may be taken in a foreign country by any secretary of legation or consular officer." Upon the conclusion of the argument the court expressed its doubt that depositions could be so taken, and that it would take further time to examine and consider the question, whereupon proctors for libelants stated that their witnesses were poor, and had come from a considerable distance and at great expense, and it would be great inconvenience and might work great hardship if they had to return to testify as to any matter brought out in such deposition, in the event that the court should hold the deposition admissible, and moved that the deposition be opened. The court thereupon ruled that the deposition be opened, and that, if libelants examined witnesses in respect to matters contained therein, it would be held that they were estopped from raising hereafter any formal objection as to the manner of taking the deposition, but that they would not be thus estopped from objecting to any questions there-

in as leading or irrelevant. After such ruling, it becomes unnecessary to decide the point raised; but inasmuch as there is no authoritative decision upon it, that I have been able to find, it may be as well to say that, in my opinion, depositions de bene esse, under section 863 of the Revised Statutes, cannot be taken in a foreign country. This section relates to the taking the depositions of witnesses residing within the United States, and designates the officials before whom they may be taken, and must be strictly construed. Cortes Co. v. Tannhauser (C. C.) 18 Fed. 667; Bird v. Halsy (C. C.) 87 Fed. 677. Among those named in section 863 as authorized to take such depositions are notaries public, and it is contended that by section 1750 secretaries of legation and consular officers are authorized to take oaths, affirmations, affidavits, and depositions. There is no doubt that ordinary depositions may be lawfully taken before them, but depositions de bene esse are not ordinary notarial acts, such as a notary public could perform simply by virtue of his office.

Objection is made to nearly all of the questions propounded in this deposition because they are irrelevant to the issue. It is elementary that no evidence is properly admissible but what applies to matters in issue between the parties, and nothing is in issue but what is averred on one side and denied on the other. While in admiralty the formalities required in pleading at common law or in equity are not demanded, if the respondent wished to avail himself of any particular matter of defense he should present it with proper averments in his answer or plea, and should set out clearly and explicitly the facts relied on; and proofs should correspond substantially with the allegations, so as to prevent surprise. The pleadings here made but one issue, and that was the amount to be awarded. If respondents desired to set up another defense, it should have been made either by amendment to the answer or by proper plea. Certainly the libelants were entitled to some notice that a new defense was to be set up. In effect, the steamship company has attempted to make itself a party in the place of its legal agent, who, under the admiralty practice, was defending in its name, and has set up a new and altogether different defense. This cannot be done ex parte. The questions put to the witness are in flagrant violation of the rule which forbids leading questions. The story of the alleged offer of a gratuity is simply the story told by the counsel examining the witness, which receives his verbal assent. There is nothing to indicate that the witness was hostile or unwilling to testify, and none of those circumstances which frequently justify courts in allowing leading questions. Inasmuch, however, as the deposition was admitted under the circumstances above detailed, and the testimony of libelants has been taken, I have given to the testimony as to the alleged offer of gratuity such weight as it would be entitled to if free from the objections stated, and my conclusion is that it is insufficient to sustain the contention that the salvage has been forfeited by such alleged offer of gratuity. Roberts and Albury, who were examined before me, deny positively making any such offer. Their licenses from the district court of Florida are official certificates of good character. "In cases of misconduct set up, there must be a special allegation of facts, with due certainty of

time, place, and circumstance." Ben. Adm. § 486. In this intervention there is no allegation of the time or place of the offer of gratuity. Proper certainty and precision in a matter of this kind are of importance, because the party cannot regularly prove that which is not properly alleged. Nor does the testimony supply the deficiency. The amount offered is not stated. Everything relating thereto is vague and indefinite. The master states that it did not occur to him until some time afterwards that this offer was intended as a bribe. If there was any conversation tending that way, there is nothing in the record which shows that it had any effect, for there was nothing in the conduct of the master which showed any leaning towards the salvors.

It remains, therefore, to determine the amount of salvage which should be awarded. Among the ingredients of the salvage service are: First, the degree of danger to human life and to property, and the value of the property saved. It is not pretended that there was any danger to human life. The value of the steamship, as proved, is that the ship was built in 1894 at a cost of $130,000. The experts who have testified to her value fix it at about $100,000. The value of the cargo as shown by the manifest was about $67,000, and the freight about $13,000. A small part—the least valuable—of her cargo was jettisoned. The sum of $200,000 to $225,000 would be an approximate estimate of the value of the ship and cargo. As to the danger to the property, the testimony shows that the ship ran aground upon a coral reef about 90 miles from Key West, upon a lonely and desolate coast, at a time of the year when storms might naturally be expected; but during the time that she was aground there was but a slight wind, and an examination of the ship's bottom made by a diver after her arrival in Charleston showed that she was not injured. After she was floated and had been hauled into deep water on the afternoon of September 14th, there was not sufficient wind to enable the small boats upon which the cargo had been placed to go alongside in order to reload, but on the next day there was some wind and a rough sea. The extreme velocity of the wind during the 15th was 23 miles an hour, and the reloading required some care and was attended with some little risk. Second, as regards the salvors. The ingredients to be considered are the danger to human life, the danger to the property employed in the salvage service, and the value of such property, and the time, labor, and skill employed in the service. The testimony shows that 18 or 19 wrecking sloops and schooners assembled at the scene of the wreck. A few of them did not arrive until the steamship was hauled off, but 15 were used as lighters, upon which the cargo was placed. There were also some small boats, not licensed, which belonged to the man engaged in the service. There were 120 or 130 men gathered about the scene of the wreck, who unloaded the cargo that was placed in their boats. They also carried out the heavy anchor about 90 fathoms from the ship, upon which the ship heaved with her own engines, and thus the steamship got afloat. The service was unattended with any risk to human life, and the risk to the property engaged was that which might have followed if a storm had arisen while these boats were laden with so much of

the cargo as was lightered, about 90 miles from a port. These licensed sloops and schooners belonged to the men who live upon the Keys along the Florida coast. The men, as a rule, are farmers and fishermen, and their vessels are used in their business of fishing and in carrying freight along and about the Keys and Key West and Miami. The character of the coast is such that it is impracticable to have a large and expensive plant for wrecking purposes, such as is found at the commercial centers, and experience has shown that a light and inexpensive class of vessels, scattered along the entire length of coast for nearly 200 miles, is the best means for the protection of commerce. The district court of that district therefore has encouraged the keeping of this class of vessels, and grants licenses to these wreckers. There is not a sufficient amount of wrecking business to enable them to live entirely from such employment, and they are compelled to use their boats for other purposes. To entitle them to a license, they are required to provide themselves with certain appliances used in the wrecking business, such as additional ropes, tackle, and anchors. When a ship is found to be aground, the wrecker who lives nearest to the scene and first discovers it approaches and takes charge, and he generally sends for others, and is known as the "master wrecker." The rules of the court require the licensed wreckers to report to the scene of the disaster, and they agree among themselves as to the distribution of such award as is made. It is impossible to fix with exactness the value of the vessels that were engaged in this service. One of the witnesses has estimated the value of these licensed wrecking sloops and schooners at about $27,000, which does not include the value of their wrecking apparatus. This, probably, is a full estimate of their value. The case did not call for the exercise of any great degree of skill. The unloading of the cargo and the reloading of it was a laborious service under a September sun. The wreckers assembled on the morning of the 13th, took out the anchors and unloaded the cargo during the day, and that night upon the high tide the ship came off the reef, using her own power in heaving.

The libel states "that at midnight on said 13th day of September, Anno Domini 1899, the said steamship was floated, but, owing to the heavy swell and strong current, she again went ashore." The answer charges "that by the unskillfulness and negligence of the libelants she was allowed to get ashore again." There has been a good deal of testimony as to the causes of the second grounding. Some of the libelants' witnesses say that it was owing to the fault of the master of the steamship in taking up an anchor which the master wrecker told him to leave down. It is the duty of the master wrecker to make a careful survey and soundings of the neighborhood where the wreck lies, and to devise the best means to save the property speedily. By rule 14 of the wrecking rules it is made the duty of the master of the wrecked vessel to remain by the wreck and superintend the operation of the salvors, in connection with the master wrecker. There was undoubtedly fault somewhere in allowing the vessel to get aground the second time. If it was entirely clear that this was the fault of the master wrecker, the award should

be reduced. I cannot say that the fault was entirely due to him, but it is not clear that he was entirely free from fault. He says that he told the master not to take up the anchor. If he had made a careful survey of the bottom, and had pointed out the danger which would follow, it is scarcely conceivable that the master would have disregarded his advice. While I cannot say that he should be condemned, I must conclude that he did not exercise that high degree of skill or show that decision of character which entitles him to special commendation and reward. It was this second grounding which made necessary the services of the steamtug Dauntless, that came up the next morning. Upon the arrival of the Dauntless on the morning of September 14th the Alexandra was aground. The master of the Dauntless made some arrangement with Roberts, the master wrecker, to assist in the salvage service; and, after making the necessary arrangements for carrying out the ship's anchors, she pulled upon her and floated her at high tide on the afternoon of September 14th. The Dauntless is a steamtug of considerable power, and she was on her way from Havana to her home port when she espied the Alexandra, early on the morning of September 14th. The time actually engaged in the service of pulling was from about 11 in the morning to 2:10 p. m.; and the Alexandra was hauled out into deep water, and the Dauntless proceeded on her voyage. The value of the Dauntless is about $35,000. The service performed was meritorious. It was performed with the proper skill and dispatch, and was attended with no particular risk; the only risk or danger to the Dauntless being that, in the event of a hawser breaking, she might have gone aground upon some of the reefs. The bottom at that point is of coral formation; and care and skill were necessary to avoid going aground while engaged in the service. During the time when the service was performed the winds were light, and the weather fair.

The amount to be awarded for salvage service is always a question of delicacy and difficulty. Full and fair compensation for the work and labor actually done, and for skill and diligence, is always allowed, and consideration must be had of the dangers and difficulties of the service. This much the salvors are entitled to as of right, and to this amount should be added so much as, in the discretion of the court, is reasonable and proper, in the interests of commerce, to encourage others to like exertions to save life and property in peril. In view of the dangerous character of the south coast of Florida, and of the want of any extensive or expensive appliances for the aid of vessels in distress, the district court grants its license to certain people living on the Keys along the coast, and requires that they provide themselves with certain equipment and conform to certain regulations. This equipment is often inadequate to all the service demanded, but, such as it is, it is frequently the only means of relief immediately available; there being no large seaports near, nor means of telegraphic communication. Under these circumstances, the highest degree of skill and the best equipment are not to be expected. Promptness in repairing to the scene of peril, readiness to assist, and the faithful doing of all that limited powers enable to accomplish,

entitle such licensed wreckers to liberal compensation, which should be increased if there are circumstances of unusual danger, calling for heroic action or imposing uncommon hardship. This compensation is not to be diminished by reason of the fact that the persons engaged in the business eke out a precarious living by using their vessels for other services, as is shown by the testimony in this case. Scattered among the Keys that fringe the desolate and inhospitable coast whose reefs of jagged rock lie open to the infinite march of the Atlantic, and beckon to almost sure destruction when its black waves, lashed to rage, smite upon them, these men are the only hope of succor to the unhappy mariner. When one considers the greatness of the enemy that they must do battle with, the living fury of the waters, the unwearying and implacable enmity of the ocean, and the frail craft in which they breast its storms, and the death that lurks in the deep sea, there comes a feeling that the measure by which compensation pro opere et labore is commonly meted is infinitely inadequate. Yet nothing seems to be better settled in the law of salvage than that courts, in making their awards, shall be governed by the conditions actually prevailing at the time when the service was rendered; that merely apprehended or possible dangers are speculative and apt to be misleading. Governed by this rule, I cannot say that the testimony discloses any actual or immediate peril either to the salvors or to the salved. The court is asked to award a lump sum, to be divided as they may agree between the licensed wreckers and the owners and crew of the tug Dauntless. The service of the latter, meritorious and efficient as it was, is of the simplest known in the law of salvage. On her course from Havana to her home port, a happy chance brought her to the spot at the time of need. A few hours of work, to which she was well adapted, imposing no unusual strain, and accompanied by no uncommon peril, and it was done. Her work was made necessary by the second grounding, and as her share of the salvage will diminish the amounts received by the other salvors, they will suffer to that extent, whether the second grounding was due to their fault, as contended by the claimants, or to accident, as propounded in the libel, for the salvage service must be regarded as a whole. It would serve no good purpose to refer to the numerous cases cited by counsel. The books are full of them, and they have all received careful consideration; but, as each case must be determined by the facts peculiar to it, they furnish no guide to any infallible conclusion. The latest case on the Florida Reefs (decided in 1896) is The Alamo, 21 C. C. A. 451, 75 Fed. 602, in which the careful and well-considered opinion of Judge Locke, of the district court of Florida, sets forth the peculiar dangers and conditions that prevail in that region. His judgment, affirmed by the circuit court of appeals, seems to furnish the best, as it is the latest, rule by which cases arising in that quarter should be determined. The Alamo went aground on one of the coral reefs, about 15 miles from Key West, at a speed of about 12 miles an hour, upon the highest crest of an outside reef, in such manner that she had to be pulled off inside the reef, and not into the open sea. Licensed wreckers and one

steamtug went to her assistance and worked on her from the afternoon of January 22d to the morning of January 24th, and lightened her of 300 tons of cargo. During the time that she was aground the highest velocity of the wind was 18 miles an hour, which increased within two days to 43 miles an hour. Owing to the high wind and heavy sea, the work of lightering the cargo was dangerous, some of the vessels being injured; and the court comments on "the remarkable skill and daring of the salvors." The agreed value of the property salved was $515,000, and the amount of salvage awarded below was $15,000, which the court of appeals says was not so extravagant as to shock its conscience, but probably more than it might have allowed. In all essentials, this case would seem to justify a much higher award than that now to be determined. The property salved was twice as valuable. The difficulties and dangers attending the salving were more than twice as great. The number of vessels and men engaged on the Alamo is not stated in the opinion, though it appears that the ship was lightered of "seven loads of cargo, about 300 tons, measurement." In this case there were about 15 loads, of about 130 tons; the cargo of the Alamo lightered being of sugar, potatoes, oil, iron, whisky, liquors, coffee, and rice; that of the Alexandra being cotton and cotton-seed meal. The Alamo was 15 miles from Key West; the Alexandra, 90 miles. But the court says on this point that, "as far as being in a condition of safety or danger, she might as well have been on French, Conch, or Pickle reef"; that the "point upon which the ship rested was as fully exposed as it might have been a hundred miles distant, and the means of assistance at Key West were exhausted when the salvors who came to her aid offered themselves." In the Alamo all of the cargo was saved. In the Alexandra a part was lost,—not, however, through any fault of the salvors. I am of opinion that the amount offered in settlement was a full and liberal sum, and, if the money had been paid into court, no costs would have been allowed.

The claimants ask that costs be not allowed, because of the exorbitant bond demanded for the release of the ship. It appears that libelants demanded a bond for $40,000, but the clerk, in the absence of the judge, very properly fixed the amount of the bond at $20,000, which was given; and it does not appear that the claimants have suffered loss from the demand of what, under the circumstances, was an exorbitant requirement. A decree will be entered in favor of the libelants for $11,500 and costs.