## THE KIA ORA.

(District Court, E. D. Virginia. September 18, 1917.)

1. SALVAGE ⊙⟶30—RESCUE OF VESSEL STRANDED AT SEA—AMOUNT OF COMPENSATION.

    The British steamship Kia Ora, on a voyage from Australia to London, while going at full speed, fast grounded on a coral reef in the Bahamas in February. She was a large vessel, comparatively new, and worth from $1,800,000 to $3,000,000, and her cargo was valued at $2,500,000. In response to her wireless signals for help, libelant's wrecking steamer Relief, with a crew of 70 men, was sent to her assistance from Kingston, 360 miles distant. The Relief was specially built and equipped at a cost of $450,000, and was maintained at Kingston expressly for such service. She reached the steamship in 2½ days, and after 5 days' work succeeded in freeing her in such condition that she proceeded on her voyage unaided. Cargo of the value of about $428,000, consisting mostly of frozen meat, which could not be kept after its removal from the storage rooms, was jettisoned. The Relief was the only vessel available which could have rendered the service, which was performed very promptly and efficiently. The steamship was in great danger from gales, which at that season were to be anticipated. Held that, under all the circumstances and in view of the large salved value, libelant was entitled to an award of $100,000.

2. SALVAGE ⊙⟶26—COMPENSATION—BASIS OF AWARD.

    While a salvage award should not be made entirely on a percentage basis where the values are large, it is proper to take the salved value into consideration in fixing a fair and just compensation.

3. SALVAGE ⊙⟶27—SUCCESS OF VENTURE—COMPENSATION.

    The completeness of success of venture should not militate against libelant in fixing award. Respondents should not complain of their own good fortune, or have their benefactor suffer on that account.

In Admiralty. Suit for salvage by the Merritt & Chapman Derrick & Wrecking Company against the steamship Kia Ora. Decree for libelant.

Hughes, Little & Seawell, of Norfolk, Va., for libelant.

Chauncey I. Clark and Burlingham, Montgomery & Beecher, all of New York City, and Hughes & Vandeventer, of Norfolk, Va., for respondent.

WADDILL, District Judge. On Saturday evening, the 24th of February, 1917, about 6 o'clock, the British steamship Kia Ora, en route from Melbourne, Australia, to London, via the Panama Canal, stranded on the south end of Castle Island, at the Crooked Island Passage, in the Bahamas, West Indies, at a point offshore of the lighthouse. The ship was proceeding at her full speed of about 12½ knots an hour, and struck head on on an uneven coral reef, grounding

---

⊙⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

her from about amidship to her stem. She at once sent out wireless calls for assistance, which were promptly responded to by the Merritt & Chapman Derrick & Wrecking Company, the libelant herein, from their Kingston, Jamaica, station, about 360 miles distant from the steamer; that being the nearest possible place from which assistance could be procured.

Libelant immediately put aboard the necessary appliances for the expedition, left Kingston early on Sunday morning, and reached the grounded vessel about 6:30 on Tuesday morning, February 27th, and at once took control of the stranded vessel, and rendered every assistance to relieve and float her, which she succeeded in doing late on the following Saturday, March 3d. On the next day, Sunday evening, the 4th, the Kia Ora proceeded on her voyage unaided. Upon reaching Newport News, where the Kia Ora stopped for bunker coal, the libel to recover for the salvage services performed was filed, and process duly served; the parties not having been able to agree upon the amount of the same.

[1] The Kia Ora was a large passenger, freight, and mail steamship, of 6,557 tons gross, 4,168 net, 448 feet long, 57 feet beam, 34 feet deep, and a cargo capacity of 11,800 tons. She was classed A1 at Lloyds, and built in 1907 at a cost of about $700,000. Her value at the time of stranding, under requisition for war purposes, was $1,772,620; if not under requisition, at existing rates, her value would be about $3,000,000. At the time of the stranding the ship was heavily loaded with a large and valuable cargo, consisting of 10,000 bales of wool, 50,000 carcasses of mutton, 3,000 carcasses of lamb, 2,320 quarters of beef, and 15,000 crates of cheese, of the total value of $2,565,863.

The libelant's steamer Relief was a large and valuable wrecking steamer, 200 feet long, 30 feet beam, 20 feet deep, built and equipped with a large and costly outfit especially for relieving vessels in distress, carrying a crew of 70 men, including officers; the value of the ship and outfit in the enterprise being the sum of $450,000. The libelant claims, for its services in salving the vessel, the sum of $600,000. The respondent, not denying the right of the libelant to recover as salvor, and for a substantial amount, admits that the services rendered were salvage services, but of a low order of merit, and that the sum claimed is grossly excessive.

The question of the character of the services, and how performed, frequently a subject of much dispute in cases of this sort, is eliminated here, since the parties themselves entered into a written agreement at the time of commencing the work for salving the vessel, and that such services should be paid for upon agreement by the salvors and owners respectively; and on the 4th day of March, 1917, at the conclusion of the work, the Kia Ora's master, writing from his ship, gave the libelant the following certificate:

"This is to certify that in getting the above ship off Castle Island that Capt. Davis worked hard, under great difficulties, having strong winds and current and very nasty swell to contend with in laying his anchorage. He spared neither time nor energy, and he worked in a most satisfactory and expeditious manner.        [Signed]  A. C. Read, Master."

There is little or no conflict in the testimony as to any material fact in the case. Counsel for respondent did not so much as cross-examine Capt. Davis, the wrecking master and chief witness of the libelant, who gave a most complete, intelligent, and graphic account of the entire salving adventure.

Respondent insists that the salvage services were of a low order of merit, which is only true in that they may not contain elements of the very highest order; that is to say, the court is inclined to think, from the testimony, that the lives of the salvors were not seriously imperiled, nor was the salving property placed in great jeopardy in connection with the service. But, nevertheless, the services rendered cannot be said to be of a mean order, and, on the contrary, they were of a peculiar and highly meritorious character, in view of all the circumstances surrounding the same, having regard especially to the manner of their rendition, the persons and property rendering the same, the fact that no other assistance was available, the serious condition in which the ship was found, the danger in which she then was, the character of the weather, wind, and sea, the danger of storms reasonably to be anticipated, and the very large values at stake, including the precarious character of the cargo salved, all of which enter into the ascertainment of the proper amount to be awarded, and which will be considered in the order named.

First. The persons rendering the service, and the location of the vessel, should be taken into account. The vessel stranded upon a coral reef, and those doing the work were professional salvors, equipped to render aid to stranded vessels all over the world, and especially in the waters where this accident happened. They had had experience in saving ships from wrecks on coral reefs, which, coupled with their knowledge and experience generally of the wrecking business, should be taken into account, as it most probably—indeed, almost certainly—largely entered into the dexterous manner in which the ship was relieved not only from peril, but without harm to herself.

Second. The fact that no other assistance was available is a most important factor in the case, and should count for much in the making of a proper salvage award. The stranding was of a most dangerous character, by reason of the reef on which it occurred, and the size and weight of the ship. It was on a lonely sea, well away from the course or lane of vessels of the size of the one in distress, and was of such a nature that no ordinary ship, should one chance to pass, would have been of material assistance. Only professional wreckers equipped for the longest and most difficult service, such as libelant, would be of assistance, and they were 360 miles away, none other nearer than Norfolk or New York that could be gotten under about a week.

Third. The services were rendered most promptly and efficiently. On the night of the accident, upon receipt of the wireless call, the equipment was all gotten together, including the full crew of 70 men, and in a few hours the journey to the stranded ship was entered upon, and, though 360 miles had to be covered, early on Tuesday morn-

ing, the second day after starting, the Relief was alongside the Kia Ora. The wrecking crew at once took control of the steamship, proper cables were laid, and anchors cast, to hold the same in position, and every effort immediately made for the Kia Ora's release from the reef on which she had been driven. Work proceeded from 6 in the morning until 10 at night, sufficient men not being obtainable to work the entire 24 hours a day. In this effort, it became necessary to remove much of the cargo from the ship, so as to lighten the bow, and to jettison portions, of which a large part came from the refrigerating rooms. Libelant had to hire and pay the crew of the Kia Ora to aid in this service, with a view of expediting the work, and because they were more inured to the cold than the natives of that section, who were apprehensive of danger from exposure to the refrigerating rooms; and it was a portion of the cargo thus removed from the refrigerator that had to be jettisoned. The labor was most arduous and difficult, during all of this time, and continued from Tuesday morning until Friday night, when the vessel first showed a little life. During the late night of that day, and on the next morning, she moved slightly, and as the day progressed this condition improved. She was finally gotten off at 3:50 p. m. of Saturday, March 3d, and moved under the lee of the land, and late on the next day, Sunday, March 4th, she proceeded on her voyage, her bottom, keel, etc., having been thoroughly examined by divers of the libelant in the meantime, and her machinery overhauled, to ascertain the possibility of danger in her so doing.

Fourth. The condition in which the ship was found, and whether she was in serious peril in her stranded position, should be especially considered. This was a large ship, 448 feet long, heavily laden, which had been driven hard and fast upon a coral reef when going full speed ahead of 12½ knots an hour. The evidence of the wrecking master on this point is as follows:

"Q. What did the soundings disclose as to the location and condition of the vessel? A. She was 13 feet canted forward; her bow had run out 10 feet, so that, where she had drawn 23 feet of water when she went there, the water mark as she lay on the reef, and the sounding showed 10 feet at her bow at that time. Q. You lifted the bow up 13 feet? A. Yes, sir. Q. What did you find as to where she was aground? A. She was hard on the ground from about amidships to the bow, or to nearly the bow; the bow curls up, so it seemed she was not actually touching for about 30 feet abaft of her stem right amidship. Q. And from there on? A. She was afloat, with 30 feet of water at her stern. Q. Please state to the court the nature of the place upon which she was aground? A. Coral limestone bottom, from 10 feet at her bow, the bottom shelved off to 31 feet at her stern, and was uneven to the extent of 18 inches or 2 feet, seemed to run in shelves, and there were coral rocks lying around. Q. Any exposed rocks in the immediate vicinity? A. On her starboard side, and 100 feet away, abreast of the foremast, there was a ledge, and from there up on the starboard side, there were rocks showing their heads between the sea. Q. And you say the bottom was coral rock? A. Coral limestone formation; dead coral, which eventually becomes limestone. Q. Can you say whether or not there was any sand overlying the coral rock? A. A few barrels of sand in the headlands, but the surface of the rock was swept absolutely clean by the sea and current. The water was clear, and the bottom could be distinctly seen. Q. Did you see it? A. I did."

It was not until with the aid of wrecking appliances of the most powerful character, working four days and nights continuously, and the removal of a large part of her cargo, that she made any perceptible move, and it took 24 hours more to extricate her from the reef. The court is satisfied, from these facts, that the ship was in a position of great peril.

Fifth. The kind of weather, wind, and sea during the stranding, as well as the dangers from storms reasonably to be expected in that latitude, should not be lost sight of in reckoning the danger in which the ship was, or to which the salvor vessel and crew were exposed in rendering the service, all of which should be kept in view in estimating the proper salvage award to be made. The testimony establishes that the wind at the commencement of the service, on Tuesday morning, was moderate; that it sprung up that night, and blew from 25 to 30 miles an hour, and thus continued during the remainder of the service, reducing a little as night came on—the minimum being 25 and the maximum 35 miles an hour. The prevailing direction of the wind was about east, with strong currents striking the ship square on the starboard side, and with the swell on her port. The Kia Ora's master properly certified under those conditions, that the salvor "worked hard, under great difficulties, having strong winds and current and a very nasty swell to contend with, in laying his anchorage."

The court is convinced that, with the existence of these weather conditions, both ship and cargo would have sustained a serious loss, had not relief been afforded promptly. Nor can it be said that the ship was not in danger from storms reasonably to have been anticipated. The testimony shows that in these waters northeast gales are liable to occur every 10 days or 2 weeks, between the months of November and April. Such a storm would probably have resulted in the total loss of the ship and most of the cargo.

Sixth. The values of the salved vessel and cargo are unusually large, much of the cargo being of a precarious kind, when subjected to removal from the refrigerator in order to lighten the ship. The ship's value is variously estimated from $1,772,620 to $3,000,000; the former figure being her estimated worth at this time under requisition, and the latter what she would now be worth, if free from governmental control. For the purpose of reaching a just award, the court thinks the value may be treated as of the first amount, viz. $1,772,620, though there is much force in libelant's contention as respects its greater value. The cargo was valued at $2,556,863, from which should be deducted, in arriving at the salvage value, $428,310, the value of the portion lost when jettisoned, after removal from cold storage, leaving the value of the cargo salved $2,128,553, and the total salved value of the ship requisitioned and cargo $3,901,173. This is the lowest value given of the salved ship, and is $1,227,380 less than claimed by libelant.

The libelant's salving outfit, used in this enterprise, is admitted to be of the present value of $450,000, which does not include the value of its plant at Kingston, maintained and kept up especially for wrecking purposes in that territory, at a cost of $36,000 per year. The testimony is that the ship Relief and her equipment, in connection with

the maintenance of that plant, are of incalculable benefit to shipping in that section and of great value to her owners.

Having considered the testimony as bearing upon the elements entering into the allowance of salvage, we are brought to the consideration of what would be a proper award to make, which is always a difficult question to determine, as so many and such varying circumstances and conditions have to be taken into account.

Counsel have cited quite an array of authorities, which have been carefully examined, but need not be referred to generally, as they are largely governed by the facts of the particular cases, and the court will content itself with citing and discussing only a few of them, as illustrative of the principles on which salvage is awarded, and as throwing light upon what should be a proper allowance in this case. The Ocean Belle, Fed. Cas. No. 10,961; The Alamo, 75 Fed. 602, 21 C. C. A. 451; The Alexandria (D. C.) 104 Fed. 904, 911, 912; The Sandringham (D. C.) 10 Fed. 556; The Haxby, 83 Fed. 720, 28 C. C. A. 38; The Lamington (D. C.) 80 Fed. 159, on appeal, 86 Fed. 675, 30 C. C. A. 271, and note thereto; The St. Paul, 86 Fed. 340, 30 C. C. A. 70; Hughes on Admiralty (1st Ed.) § 66, pp. 125, 140.

The first three of the above-named cases each involve salvage services rendered stranded vessels upon coral reefs off the coast of Florida, and are entitled to much consideration in arriving at a just conclusion under the facts of this case. In the Ocean Belle Case, a decision by District Judge Marvin, of the district of Florida, rendered in 1861, an award of $17,000 was made upon values aggregating $165,000; in the Alamo Case, a decision of Judge Locke, of the said district, affirmed by the Circuit Court of Appeals of that circuit, an award of $15,000 was made upon values of $500,000; and in the Alexandria Case, a decision of Judge Brawley, of this circuit, an award of $11,500 on values of $200,000 to $225,000 was made. In neither of these three cases were the values either of the properties salved or that of the salvors, at all comparable to those here; nor were the dangers to which they were exposed, taking into account the remoteness of this stranding from a place of possible assistance, anything like so great as here.

The cases of The St. Paul and The Lamington, supra, are referred to as bearing upon the proper basis for allowance of salvage. The St. Paul (D. C.) 82 Fed. 104, is a decision of Judge Addison Brown, of the Southern district of New York, and The Lamington, of Judge Benedict, of the Eastern district of New York; and in each case the action of the lower court was reviewed by the Circuit Court of Appeals of that circuit, presided over by Judges Wallace, Lacombe, and Shipman. Judge Brown's decision in The St. Paul case was affirmed by the appellate court, and will be considered in detail, as the values involved and the services rendered more nearly correspond to those in this case. There the salved value was $4,016,041, with freight money of $16,092 for 11 days' services, with a large number of salving vessels, valued at $400,000, aiding, their crews aggregating 205 men, and an outlay in cash of about $10,000. The sum of $160,000 was awarded; the court apportioning against the ship, valued at $2,000,000, the sum of $131,012.48. This stranding occurred in a fog, and the court commented on the fact of the promptness with which the serv-

ice was rendered, and the efficiency of the same, and stated that a larger award would have been made, but for the shortness of the time taken and the lack of danger to the enterprise, on account of smooth water and good weather; and the appellate court especially noted the fact that the values involved were the largest in any reported admiralty case up to that time. It is manifest that the values in this case are quite as great as those involved there. In the St. Paul case it will be. noted that the stranding occurred on the Jersey coast, only a short distance outside of Sandy Hook, where the opportunity of assistance was near at hand.

The Sandringham, supra, 10 Fed. 556, a decision of the late Judge Hughes, of this district, will be found to contain an able and interesting discussion of salvage awards, and the principles governing and controlling the same. There an allowance of one-fourth of the value of $200,000 was made, and from that decision no appeal was taken.

The Haxby, 83 Fed. 720, 28 C. C. A. 38, supra, the Circuit Court of Appeals of this circuit, presided over by Judges Goff, Simonton, and Brawley, in a decision by Judge Goff, reduced an allowance of the District Court to $16,666.66, or one-sixth of the value of the property salved, viz. $100,000, and the salving property engaged in the service was $117,000, the time taken 3½ days, and 24 men employed, and, though the ship was in a place of danger, the service was accomplished with but little risk.

In the recent case of Merritt & Chapman Derrick & Wrecking Co. v. The Sahara, 246 Fed. 141, a decision by Judge Rose, of the Maryland district, during the present year, the sum of $12,500 was awarded upon the value salved of $400,000 and the salving property $100,000. The vessel grounded on the Atlantic coast of Virginia, near Ship Shoal Inlet, was not in a position of much danger, was relieved at high water by a few hours work of the wrecking tug Rescue after reaching the scene of the accident, without assistance from the ship's engines, and neither the crew nor the Rescue encountered serious risk.

[2] Counsel for the respondent insists that, in fixing the allowance of salvage, the court should not undertake to base the same upon a percentage of the value of the property salved; that that method is antiquated, and should be no longer followed. The court is inclined to concur in this view, that that is not the proper, nor certainly the practical, rule of arriving at a fair and just compensation, where values are large, as in the present case. The following authorities sustain this view: Hughes on Admiralty, supra, p. 138; The Suliote (C. C.) 5 Fed. 99; The Baker (C. C.) 25 Fed. 771; The Gambetta, 74 Fed. 259, 20 C. C. A. 417; Guffey Petroleum Co. v. Borison, 211 Fed. 594, 128 C. C. A. 194.

While ordinarily the percentage rule, merely as fixing the basis of allowance, should not be adopted, particularly in cases of large salved values, as here, the amount of the allowance, as thus arrived at, cannot be lost sight of in fixing compensation, nor that such percentage ran as shown by adjudged cases (note to In re Lamington, 86 Fed. 685, 30 C. C. A. 271) from 3 to 85 per cent. of the value of the property salved, depending upon the special circumstances; the cases, however,

in which a greater award than 50 per cent. was made, being rare. The real end sought to be reached, regardless of the method of ascertainment adopted, is: What would be a fair and reasonable allowance for the services rendered, having in view all the circumstances of the same, together with such a sum as would be necessary to give encouragement and stimulus to salvage operations, in order that the most effective assistance to shipping overtaken by distress at sea may be secured? An award in the nature of a bounty to the salvor, in the interest of the public and commerce, is well recognized, in order that encouragement may be given to those engaged in maritime commerce, to look out for those in distress; and the fact that those, like the libelant, who make the saving of ships a business, should be taken into consideration in making such awards. The St. Paul (D. C.) 82 Fed. 108, and cases cited. They expend large sums of money in maintaining plants with valuable wrecking vessels with expensive outfits, manned and operated by most experienced and competent crews, and as a consequence are enabled to render prompt, efficient, and peculiar services, that would be impossible for ordinary vessels, not thus equipped, to do.

[3] Every element calling for a reasonably liberal salvage award exists in this case, other than the presence of extreme peril and danger to the salvors and their property in rendering the same. The values salved were most unusual in amount, the largest, perhaps, of any reported case; the amount as found by the court being approximately $4,000,000 and as claimed by the respondent over $5,500,000. The value of the salving outfit was likewise very large, nearly $500,000. No other assistance was at hand, or could have been secured; the service was promptly and efficiently rendered by a professional wrecking concern that maintained in the West Indies a large and expensive plant and outfit, with no assurance of continuous employment. Relief could only have been afforded by those thus equipped and experienced; a distance of 360 miles had to be covered to reach the place of stranding. The undertaking was entirely successful, both as respects the saving of the ship and cargo, less a comparatively small portion of the cargo which had to be jettisoned, and the ship was released and relieved without injury. The portion of the cargo lost was on account of its precarious character when removed from cold storage, in order to lighten the ship, and was not due to any negligence or omission of the salvor. Indeed, well nigh every element for the allowance of a substantial salvage award exists, unless the fact of the complete success of the venture should be said to militate against the libelant, which view the court should not for a moment entertain. The respondent in good faith and fair dealing ought not to be heard to complain of their own good fortune, and seek to have their benefactor lose or suffer on that account.

Considering the case in all of its peculiar facts and circumstances, the court considers that the amount claimed of $600,000 is grossly excessive, and that an award of $100,000 will be a fair and reasonable allowance to be made, which would be upon a percentage basis of the values of the property salved, as adopted by the court, approximately

2½ per cent., and upon the values as claimed by the libelant less than 2 per cent.

A decree may be entered in favor of the libelant for the amount thus specified, with costs.